T.C. Memo. 1997-482


UNITED STATES TAX COURT


HOSPITAL CORPORATION OF AMERICA AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10663-91, 13074-91          Filed October 27, 1997.
            28588-91,  6351-92


        N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr.,

Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark,

Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley,

and John W. Bonds, Jr., for petitioners in docket No. 10663-91.

        N. Jerold Cohen, Randolph W. Thrower, J.D. Fleming, Jr.,

Walter H. Wingfield, Stephen F. Gertzman, Reginald J. Clark,

Amanda B. Scott, Walter T. Henderson, Jr., William H. Bradley,

John W. Bonds, Jr., and Daniel R. McKeithen, for petitioners in

docket No. 13074-91.

N. Jerold Cohen, Walter H. Wingfield, Stephen F. Gertzman, Amanda B. Scott, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 28588-91.

N. Jerold Cohen, Reginald J. Clark, Randolph W. Thrower, Walter T. Henderson, Jr., and John W. Bonds, Jr., for petitioners in docket No. 6351-92.

Robert J. Shilliday, Jr., Vallie C. Brooks, and William B. McCarthy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Chief Judge:  These cases were consolidated for purposes of trial, briefing, and opinion and will hereinafter be referred to as the instant case.[1]  Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as follows:

---

[1]     The instant case involves many issues, most of which have been settled or decided already.  Separate briefs of the parties were filed for each of the distinct categories of issues involved in the instant case.  We decided tax accounting issues in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105; Hospital Corp. of Am. v. Commissioner, 107 T.C. 73 (1996); and Hospital Corp. of Am. v. Commissioner, 107 T.C. 116 (1996).  We decided an issue related to the sale of the stock of certain subsidiaries to HealthTrust, Inc.--The Hospital Company in Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-559.  We decided a depreciation issue in Hospital Corp. of Am. v. Commissioner, 109 T.C. 21 (1997).  The instant opinion involves the last remaining issues for decision, which issues the parties have denominated the captive insurance or Parthenon Insurance Co. issues.

| TYE | Deficiency |
|-----|------------|
| 1978 | $2,187,079.00 |
| 1980 | 388,006.58 |
| 1981 | 94,605,958.92 |
| 1982 | 29,691,505.11 |
| 1983 | 43,738,703.50 |
| 1984 | 53,831,713.90 |
| 1985 | 85,613,533.00 |
| 1986 | 69,331,412.00 |
| 1987 | 294,571,908.00 |
| 1988 | 25,317,840.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues to be decided are:

(1)  Whether Parthenon Insurance Co. (Parthenon), a wholly owned subsidiary of petitioner Hospital Corporation of America (HCA), is an insurance company within the meaning of the Internal Revenue Code; and

(2)  if Parthenon is an insurance company, what portion of its unpaid loss reserves and expenses are deductible pursuant to section 832(c).[2]

---

[2]  In accordance with the holding of the Court of Appeals for the Sixth Circuit in Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197 (1987), petitioners seek deductions only for reserve additions attributable to reserves for claims against Parthenon's sister subsidiaries, and not for reserve additions attributable to reserves for claims against HCA itself.  Absent stipulation of the parties to the contrary, our decision in the instant case is appealable to the Sixth Circuit.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

In General

Petitioners are members of an affiliated group of corporations of which HCA is the common parent. HCA was incorporated during 1960 under the laws of the State of Tennessee as Park View Hospital, Inc. During 1968, Park View Hospital, Inc. joined with 11 other hospitals to form HCA. After that date, and through the years in issue, HCA's stock was publicly held and traded on the New York Stock Exchange.[3]

HCA maintained its principal offices in Nashville, Tennessee, on the date the petitions were filed. For each of the years involved in the instant case, HCA and its domestic subsidiaries filed a consolidated Federal corporate income tax

---

[3]    On Mar. 17, 1989, a group consisting of HCA key management and certain outside investors acquired control of HCA and caused it to purchase all of the stock held by the public shareholders, and they then transformed HCA from a publicly held corporation to a privately held corporation. On Mar. 4, 1992, HCA again went public and changed its name to HCA-Hospital Corporation of America. On Feb. 10, 1994, HCA was merged with and into Galen Healthcare, Inc., a subsidiary of Columbia Healthcare Corp. of Louisville, Kentucky, and the subsidiary changed its name to HCA-Hospital Corp. of America. On that same date, the parent changed its name to Columbia/HCA Healthcare Corporation.

return (consolidated return) on Form 1120 with the Director of the Internal Revenue Service Center at Memphis, Tennessee.

Petitioners' primary business is the ownership, operation, and management of hospitals. Petitioners' hospitals provide health care customarily provided by hospitals. Most of petitioners' hospitals are acute care hospitals providing a facility, personnel, equipment, and medical supplies and pharmaceuticals needed to perform medical and surgical procedures to treat sick or injured persons with various physical disorders. Some of petitioners' facilities are psychiatric hospitals providing medical treatment to persons with mental or emotional disorders and drug and alcohol dependency problems. Additionally, certain petitioners operate a variety of medically-related businesses ancillary to petitioners' primary business.[4] A fundamental component of petitioners' business philosophy is the use of their combined purchasing power to obtain goods and services at the lowest possible cost whenever practical to do so.

At the outset of its organization, HCA generally placed all newly constructed or acquired hospitals in separate corporations. In later years, in some cases, HCA placed all newly acquired or newly constructed hospitals located in a particular State in a

---

[4] See Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-105, for a detailed description of petitioners' hospital operations. We incorporate herein our findings of fact contained in that Memorandum Opinion.

separate corporation rather than having a separate corporation for each hospital in that State. In a few instances, HCA acquired a group of hospitals that, for various business reasons, were placed in a single corporation or were allowed to remain in the acquired corporation.

During the years ended 1981 through 1988, as of yearend HCA owned the following number of subsidiaries and hospitals, and had the following number of patient beds:

| Year | Number of Subsidiaries | Hospitals Owned | Patient Beds |
|------|------------------------|-----------------|--------------|
| 1981 | 124 | 188 | 29,298 |
| 1982 | 124 | 186 | 29,720 |
| 1983 | 126 | 196 | 31,393 |
| 1984 | 123 | 200 | 32,515 |
| 1985 | 135 | 230 | 37,423 |
| 1986 | 122 | 227 | 37,490 |
| 1987 | [1]74 | [1]132 | [1]24,087 |
| 1988 | 74 | 131 | 23,849 |

[1]During 1987, pursuant to a plan of reorganization, petitioners divested 104 hospitals from the HCA organization by selling the stock of the subsidiaries owning those hospitals to HealthTrust, Inc.--The Hospital Co. See Hospital Corp. of Am. v. Commissioner, T.C. Memo. 1996-559, for a detailed description of that transaction.

Prior to calendar year 1977, petitioners purchased general and professional liability insurance from Continental Insurance Co. (Continental). The hospitals owned by petitioners were not permitted to purchase insurance individually from other sources.

Every State regulates the insurance companies licensed to do business within its borders. Insurance companies that are fully licensed in a particular jurisdiction often are referred to as

admitted companies. Admitted insurance companies can insure any insurable risk. Other insurance companies may be licensed to write only on a surplus lines basis; i.e., they are allowed to underwrite only risks that admitted companies in the State do not or will not cover. Admitted insurance companies are required to file annual reports on a calendar year basis with the appropriate State insurance department in a form specified by the National Association of Insurance Commissioners (NAIC).

A line of business refers to a group of insurance policies involving similar risks. Some lines of business, such as workers' compensation, can be written only by admitted carriers. Marketing is the process of selling policies to insureds. Underwriting is the selection and pricing of risks to be insured. The pricing portion of the underwriting function is the process of setting premiums in amounts that are expected to be sufficient to cover insured losses and the expenses of adjusting claims, and the costs of operating the company and any planned underwriting profit. State regulatory agencies limit the premiums that may be written by insurance companies to amounts that are prudent in light of the companies' capitalization. Premiums are usually set by trained underwriters or actuaries, who may be employees or outside consultants. For certain lines of insurance, such as workers' compensation, rates are set by law on the basis of statistical information compiled by rating bureaus, with only

specified modifications permitted to take into account the loss experience of the particular employer.

The insurance laws of some States provide for a category of limited purpose insurance companies, popularly called captive insurance companies or captive insurers.  Captive insurance company statutes generally apply to companies that insure on a direct basis only the risks of companies related by ownership to the insurer.  Because pure captive insurance companies  typically are formed for the purpose of insuring the risks of related companies, the function of risk selection, in essence, is attained at the onset.

The State of Colorado's Captive Insurance Company Act (Colorado captive insurance statute) allows the formation of pure captive insurance companies whose authority to write direct insurance business is limited to insuring the risks of related corporations.  The Colorado captive insurance statute requires a pure captive insurance company licensed in that State to maintain and to deposit with the commissioner of insurance minimum actual capital of $300,000 and accumulated surplus of $200,000, which deposit may be in the form of an irrevocable letter of credit.

The State of Tennessee's Captive Insurance Company Act (Tennessee captive insurance statute) requires a pure captive insurance company licensed in that State to maintain minimum capital and surplus of $750,000, with the surplus to be at least

$350,000. For captive insurance companies, the Tennessee Department of Commerce and Insurance, Division of Insurance (Department of Insurance), requires the ratio of net written premiums to policyholders' surplus (i.e., the net worth of an insurance company) to be no greater than 3 to 1. Captive insurance company rates may not be excessive, inadequate, or unfairly discriminatory. The Tennessee captive insurance statute does not require pure captive companies to use the NAIC format.

Tennessee insurance company regulatory provisions require less startup capital for "pure captive" insurers than for companies licensed to sell insurance to the general public, impose lower premium taxes in comparison to commercial companies, and provide an exemption from participation in State involuntary risk plans, such as assigned risk pools and guaranty funds. The business functions and operations of captive insurance companies in Tennessee are subject to examination by the Department of Insurance at least once in a 5-year period, or when the Commissioner deems it prudent to conduct an examination. Business functions include underwriting, marketing, investing, claims adjusting, loss reserving, and financial reporting.

Prior to the mid-1970's, the availability and price of coverage for medical malpractice risks were not significant concerns for an organization the size of HCA. During the mid-1970's, however, increases in the size and frequency of medical

malpractice awards led to a crisis in both the price and the availability of medical malpractice insurance. Some physicians and hospitals formed mutual insurance associations or pools because the insurance industry was unwilling or unable to provide malpractice coverage at a price that the physicians and hospitals considered reasonable.

During 1976, in response to the uncertain availability and high cost of medical malpractice insurance, petitioners considered alternative methods to provide professional and general liability coverage to hospitals which were owned directly by petitioners at a lower cost than commercial insurance available from various third party insurance companies. Alternatives contemplated included self-insuring, joining with competing hospital companies in the formation of a malpractice insurance company, or forming a wholly owned captive insurance company whose principal business would be to provide insurance for the liability risks of petitioners' hospitals. During the time that petitioners were considering those alternatives, approximately 40 to 45 percent of the revenues of petitioners' hospitals came from reimbursement of costs for patient care by the Federal Medicare program. Consequently, the reimbursability of premium costs by the Medicare program was a significant consideration in evaluating the alternatives.

- 11 -

At all relevant times, the Healthcare Financing Administration (HCFA) of the U.S. Department of Health, Education and Welfare (or its predecessor agencies) administered the Medicare system of reimbursement. During the mid-1970's, existing Medicare regulations did not address reimbursement of premiums payable to captive insurance companies. Medical industry efforts, however, eventually resulted in the promulgation of specific regulations during 1979 which allowed reimbursement of liability premiums charged related entities by limited purpose or captive insurance companies, provided that appropriate regulatory standards were met. The Medicare standards ultimately adopted included requirements that the captive insurer be recognized as an insurance company by an appropriate Government and be operated in accordance with the jurisdiction's laws, that premiums be determined according to actuarial standards, that only reasonable premium costs be reimbursable, and that the arrangement represent a prudent business decision. Compliance with those requirements was monitored through comprehensive annual audits.

From 1981 through 1983, Medicare reimbursement to hospitals for providing covered treatment was made on the basis of the hospitals' direct costs and allocated indirect costs, including premiums paid for qualifying general and professional liability insurance (malpractice insurance). Beginning in 1983, and over a 4-year transition period, a significant part of Medicare

reimbursement was made on the basis of diagnostic related groupings, in which specific treatments or procedures are reimbursed at set rates, although reimbursement of certain outpatient and psychiatric procedures continued to be based on cost. Throughout the years at issue, petitioners wanted their premium payments for general and professional liability insurance to qualify as reimbursable costs for Medicare purposes, though the direct financial benefit of such qualification was comparatively less after 1983 than before.

The determination as to whether liability insurance premiums charged by limited purpose insurance companies would qualify for Medicare reimbursement was reviewed by intermediaries employed for that purpose by HCFA. The intermediaries conducted annual audits of captive insurance companies to determine whether the premiums charged to insureds met HCFA standards. Throughout the years here in issue, Blue Cross/Blue Shield of Tennessee, Inc. (Blue Cross) was the intermediary charged with auditing limited purpose insurance companies formed in Tennessee to determine whether the liability premiums that they charged their insureds would qualify for Medicare reimbursement.

Another consideration on the part of HCA management in evaluating alternatives to commercial malpractice insurance was

- 13 -

the prospect of Federal income tax deductions for the reserves[5] that would be maintained against insured labilities of the operating companies.  HCA management believed that setting up a legitimate U.S. insurance company managed by insurance professionals would offer the best chance of obtaining that deduction, though they realized that favorable tax treatment was not assured.

The Formation of Parthenon

During 1976, HCA formed Parthenon as a wholly owned subsidiary under the Colorado captive insurance statute, Colorado Rev. Stat. secs. 72-36-1 to 72-36-30 (1963), now codified at secs. 10-6-101 to 10-6-130 (1991).  HCA management expected that

---

[5]     In Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 350-351 (1994), affd. 65 F.3d 90 (8th Cir. 1995), we defined the term "reserve" as follows:

> In the insurance industry a policy reserve represents a liability; i.e., it represents an obligation to the policyholders.  Historically, reserves have been described in PC [property and casualty] insurance literature as estimated liabilities for losses and loss adjustment expenses.  To some extent, loss reserves are estimates extrapolated from past trends, patterns, averages, and inferences and predictions as to the future.  Accordingly, "The reserve simply operates as a charge on so much of an insurance company's assets as must be maintained in order for the company to be able to meet its future commitments under the policies it has issued."  The general concept for reserves is the same for life and PC insurance companies. [Fn. ref. omitted; citations omitted.]

an appropriate portion of the premiums would be reimbursable to the hospitals under the then-applicable Medicare regulations and deductible under the Federal income tax laws. Petitioners incorporated Parthenon in the State of Colorado because HCA's chief financial officer, who also was the executive responsible for petitioners' insurance programs, believed that the goal of building a legitimate insurance company would be advanced by having a State-regulated captive insurer, rather than an offshore company, and because at that time the State of Colorado was the only State that had adopted a captive insurance statute. In accordance with Colorado law, the initial capitalization of Parthenon was $1,500,000, $1 million of which was represented by an unconditional standby letter of credit in favor of the Insurance Commissioner of Colorado, and the remainder of which was in cash.

Parthenon commenced business during January 1977. At all relevant times, HCA owned all of Parthenon's common stock. Parthenon did not own stock in any of HCA's other subsidiaries.

Parthenon's Operations During Its Early Years

Parthenon submitted the policy form to be used for general and hospital professional liability insurance to the Colorado Insurance Department for approval. The initial policy form issued by Parthenon to petitioners provided coverage limits of $250,000 per occurrence and was a claims-made policy form. A

claims-made policy covers only losses from occurrences within the policy period that are reported during the period, as opposed to an occurrence-basis policy, which covers losses whenever reported. Other things being equal, premiums on an occurrence basis are generally greater than premiums under a claims-made policy form.

Parthenon retained the Wyatt Co. (Wyatt), an international actuarial and insurance consulting firm, to recommend the initial premium amount to be charged by Parthenon to petitioners. The recommended premium amount for policy year 1977 was $4,500,000. That amount compared to a quotation of $5,232,000 from Continental for a policy providing the same limits to the same insureds but on an occurrence basis.

During a portion of its first year of existence, Parthenon's day-to-day operations were managed by Frank B. Hall and Company of Colorado, an independent consulting firm. Senior HCA management, however, decided that Parthenon should be operated by its own employed management and staff, based in part on a recommendation of an insurance industry consultant to the effect that a properly staffed and operated company could produce a savings for petitioners of more than $1 million per year in premiums.

Parthenon's first president was the late John A. Hill (Mr. Hill), then the Chairman of HCA. Formerly, Mr. Hill had served

as a president of the Aetna Insurance Co. He was Parthenon's president until mid-1977, at which time he became Chairman of Parthenon's Board of Directors. Mr. Hill served in that capacity until October 1985.

On August 16, 1977, Parthenon hired Robert A. Reeves (Mr. Reeves) as its president. He also served as HCA's vice president of insurance. Prior to being retained by Parthenon, Mr. Reeves had been employed as president of Ashland Oil Company's two captive insurance company subsidiaries. He continued as Parthenon's president until October 1, 1985.

After becoming president of Parthenon, Mr. Reeves hired experienced insurance executives to fill key managerial positions, including Robert E. Pierson (Mr. Pierson), Maurice J. Castille (Mr. Castille), and Charles Anderson (Mr. Anderson). Mr. Pierson, a Chartered Property and Casualty Underwriter, had been employed as a claims manager for the St. Paul Insurance Companies. Mr. Pierson was hired initially to serve as Parthenon's claims manager. He also was a vice president of Parthenon from 1978 until October 1985, when he became president. Mr. Pierson continued as president of Parthenon until February 20, 1987.[6]

---

[6] William W. McInnes became president of Parthenon as of June 8, 1987. He served in that position throughout the remainder of the years in issue.

Mr. Castille, who had been the risk manager of Humana Inc., a competing hospital chain, was hired to head Parthenon's loss prevention and quality assurance operation. Mr. Anderson, a former controller of an insurance brokerage firm in the State of Kentucky, became head of Parthenon's financial operations.

On October 28, 1977, HCA contributed an additional $1 million to Parthenon as paid-in capital.

During March 1978, HCA management learned that Continental, which had been providing workers' compensation insurance to petitioners, was not interested in renewing coverage under any type of insurance plan. As a captive insurer, Parthenon could not insure workers' compensation risks directly, but it could reinsure[7] the risks of an admitted company, if the admitted company agreed to "front" the business; i.e., to insure the risks and then reinsure them with Parthenon. In that event, the States would look to the admitted company for payment of the losses, and the admitted company would look to Parthenon for reimbursement. Accordingly, during March 1978, HCA, Ideal Mutual Insurance Co. (Ideal Mutual), and Parthenon negotiated an arrangement whereby Ideal Mutual agreed to provide workers' compensation insurance to petitioners and Parthenon agreed to reinsure Ideal Mutual on that

---

[7] Reinsurance is a contract with a second insurer in which the second insurer agrees to provide coverage of risks that the first insurer has already assumed under an insurance contract with another party. 1 Couch on Insurance 3d, sec. 1:4, at 1-8 to 1-9 (1995).

insurance.  As a condition to Ideal Mutual's willingness to complete the transaction, HCA executed a May 18, 1978 "comfort letter".  That letter provided as follows:

> In consideration of the issuance of the Workers' Compensation and Employers Liability Policies by Ideal Mutual Insurance Company ("Ideal") to Hospital Corporation of America ("HCA"), its affiliated and subsidiary companies and certain of its managed hospitals and the reinsuring of said policies with Parthenon Insurance Company ("Parthenon"), HCA agrees that in the event, refusal or inability of Parthenon to provide or maintain the required Letter of Credit or to pay Ideal the cash advance against reinsurance losses recoverable under the Reinsurance Agreement, HCA will pay itself on behalf of Parthenon or cause Parthenon to pay all the reinsured losses recoverable by Ideal from Parthenon in accordance with the terms of the Reinsurance Agreement until all such claims have been settled or otherwise disposed of.

The general and hospital professional liability policy form used by Parthenon for policy years 1978 through 1985 was substantially unchanged and covered all losses arising out of occurrences during the policy period.  For each of those years Parthenon issued one policy of general and hospital professional liability insurance to "Hospital Corporation of America, or its owned hospitals, corporations, and other subsidiaries".

Premiums for the liability insurance coverage provided by Parthenon to petitioners were based on actuarial analyses of the projected loss and loss expense adjustment, using industry loss experience (and, subsequently, using the hospitals' loss experience supplemented by industry experience), to which was added Parthenon's operating expenses and the reinsurance costs.

The rate making process involved first estimating the total covered losses that would be experienced by the hospitals and then making an actuarial determination of premium rates, adjusted on the basis of geographical differences in loss costs, that could be multiplied by the number of exposure units (e.g., occupied beds, outpatient visits, and emergency room visits) of each insured hospital to reach a premium sufficient, in the aggregate, to cover the estimated losses of the entire group. Each insured hospital would pay only the geographically adjusted average loss represented by the applicable rate times its units of loss exposure.

Parthenon's Reincorporation in the State of Tennessee

The Colorado Insurance Commissioner objected to Parthenon's decision to base its full-time staff and operations in Nashville, Tennessee. Consequently, during 1978, after the enactment of the Tennessee captive insurance statute, which statute is substantially identical to the Colorado captive insurance statute, HCA decided to reincorporate Parthenon in the State of Tennessee. Accordingly, Parthenon Insurance Co. of Tennessee was incorporated under the laws of that State on December 13, 1978, and on that date applied for a Certificate of Authority to transact insurance business under the Tennessee captive insurance statute. On December 18, 1978, Parthenon Insurance Co. (Colorado) was merged into Parthenon Insurance Co. of Tennessee

(hereinafter also referred to as Parthenon), which latter company became the surviving corporation. During December 1978, Parthenon submitted to the Department of Insurance for review and approval the form of general and hospital liability policy to be issued to petitioners in 1979, and an Actuarial Review. Effective January 1, 1979, Parthenon was licensed by the State of Tennessee as a captive insurance company.

As a licensed captive insurance company under Tennessee law, Parthenon was subject to the regulatory supervision of the Department of Insurance. During August 1979, Parthenon adopted procedures and guidelines to govern the investment of its reserve and surplus funds, including an incorporation of the Tennessee regulations governing insurance company investments.

During December 1979, Mr. Reeves, as president of Parthenon, requested that HCA contribute an additional $1 million to Parthenon's capital.

Parthenon's Operations During the Years in Question

HCA management required that the hospitals owned by petitioners acquire their liability insurance from Parthenon. Parthenon did not market liability insurance coverage to hospitals owned by petitioners because they were automatically covered by the Parthenon policy. For each of the years in issue, Parthenon issued one liability insurance policy which covered HCA, its owned hospitals, corporations, and other subsidiaries.

Parthenon had no planned underwriting profit. It was a pure captive insurance company but nonetheless submitted annual reports using the NAIC format for all years in issue except 1982 and 1983. Its premium charges for liability and workers' compensation coverages were made using rates applied to occupied beds and patient visits for liability coverage and payroll amounts for workers' compensation coverage. Those amounts were charged on a hospital by hospital basis.

Hospitals not owned but managed by petitioners (managed hospitals) could elect to be insured by Parthenon. Only a small percentage of the managed hospitals were insured by Parthenon. Parthenon performed the risk selection element of underwriting with respect to its coverage of managed hospitals. Parthenon engaged in marketing of insurance to the managed hospitals. Separate liability insurance policies were issued to each managed hospital that elected to be insured by Parthenon. Respondent has not adjusted the insurance transactions of managed hospitals reported by petitioners on their consolidated tax returns and its insurance of managed hospitals is not in issue in the instant case.

During 1981, Parthenon had 16 employees. By 1986, Parthenon had 47 employees. During January 1987, all of the HCA companies underwent a reduction in force, and accordingly Parthenon's staff was reduced by 12 employees.

Parthenon did not utilize HCA's centralized cash management program, but maintained its own separate banking arrangements and cash management system. It also maintained its own accounting records, computerized information management system, and personnel files. Parthenon's employees were issued monthly checks by HCA's payroll department, which furnished payroll services to Parthenon, but Parthenon reimbursed HCA for the wage, salary, and benefit amounts paid to or on behalf of Parthenon's employees each month.

From 1981 through July 1985, Parthenon occupied quarters in a building owned by HCA. From July 1985 to February 1988, the offices of Parthenon were in a building leased by HCA. During the period 1981 through February 1988, Parthenon had either a separate written lease or sublease agreement with HCA or occupied the premises without a written lease, for which it was charged a monthly amount as rent. From February 1988 through the end of that year, Parthenon occupied quarters in a building owned by HCA, but HCA charged Parthenon no rent and there was no formal lease agreement between the parties.

Parthenon's investments were the responsibility of an investment committee appointed by its Board of Directors, subject to policies and procedures which included a requirement of compliance with the investment mandates and restrictions of the Tennessee Insurance Code. Parthenon employed outside investment

advisers to manage the company's investments under the supervision of its investment committee.  Additionally, Parthenon's investment committee received informal investment advice and counsel from HCA's corporate investment staff, under the direction of William McInnes, HCA's vice president for finance.  Parthenon's investment portfolio complied with the requirements of the Tennessee statute and was typical of the portfolios maintained by property and casualty insurance companies generally.

For the years 1981 through 1986, Parthenon issued to petitioners annual policies providing $10 million in primary comprehensive hospital liability, comprehensive personal injury liability, comprehensive property damage liability, and advertising liability coverages.  For the years through 1985, the coverage offered by Parthenon was on an "occurrence" basis, which meant that Parthenon indemnified the insureds against all covered liabilities arising out of any occurrence that caused injury during the policy period, no matter when the claim arising out of that injury was reported.  For 1986 and subsequent years, Parthenon provided liability insurance to petitioners on a "claims made" basis, which meant that coverage was extended only for claims actually made against an insured during the policy period arising out of events subsequent to a designated

"Retroactive Date", which in the instant case was January 1, 1986.

During 1981 through 1984, Parthenon assumed reinsurance of workers' compensation risks written for petitioners by Ideal Mutual.  Under the reinsurance arrangement, Ideal Mutual ceded premiums (with associated liabilities) to Parthenon, less a ceding commission designed to cover Ideal Mutual's costs and an element of profit.

Ideal Mutual became insolvent and was placed into liquidation by the New York Insurance Department effective December 26, 1984.  Following that development, HCA entered into an agreement with Continental and the New York Insurance Department whereby Continental agreed to assume the direct workers' compensation risks that Ideal Mutual had insured prior to its insolvency.  As a condition of agreeing to substitute its own policies for those of Ideal Mutual, Continental required, and HCA provided, an agreement indemnifying Continental against liabilities, other than Continental's obligations under its policies, that might result from the agreement to cede insurance obligations entered into as of September 6, 1985, between HCA and the Superintendent of Insurance of the State of New York as Rehabilitator of Ideal Mutual.  After 1984, Parthenon reinsured the workers' compensation risks assumed by Continental, receiving the premium less a ceding commission designed to cover

Continental's expenses and an element of profit.  The reinsurance contracts covering workers' compensation risks required Parthenon to post a letter of credit to secure its reinsurance obligations.

When the New York Insurance Department placed Ideal Mutual in liquidation during 1984, the receiver placed a freeze on the payment of any claims for workers' compensation against petitioners' hospitals made under policies with Ideal.  At that time, HCA operated 26 hospitals in the State of Florida that were subject to a Florida law which would tie up the bank accounts of those hospitals unless the claims of nurses and others on disability under the workers' compensation law were paid.  In order to prevent the tie-up of those bank accounts, HCA, or the applicable subsidiaries, paid those workers' compensation claims.

Through 1986, HCA paid premiums to Ideal Mutual or Continental for workers' compensation insurance and charged the applicable hospitals on the same basis that total premiums were set by the insurer; i.e., by the application of statutorily-set rates per dollar of payroll.  Commencing policy year 1987, the underlying workers' compensation policies were rated retrospectively; i.e., premiums were adjusted after the policy year to reflect the actual losses from that year, subject to minimum and maximum premium limits.

In addition to workers' compensation reinsurance, Parthenon during the years in question also assumed other reinsurance from

unrelated insurance companies that had written direct insurance covering petitioners--for example, Arkwright-Boston, which wrote direct property coverage for petitioners.  The amounts involved are less than 1 percent of total reserves at December 31, 1986, and Parthenon is not claiming a deduction for an addition to its reserves for those liabilities.

During policy years 1981 through 1986, Parthenon negotiated reinsurance agreements with a number of professional reinsurance companies in the United States and England covering portions of the risks of petitioners and of the managed hospitals that Parthenon had insured.  During policy year 1981, Parthenon ceded all potential liabilities in excess of $350,000 per occurrence to reinsurers.  Liabilities in the layer $650,000 excess of $350,000 were ceded to General Reinsurance Corp. (General Re), the largest reinsurance company in the United States.  Liabilities in the layer $4 million excess of $1 million were ceded 80 percent to General Re and 20 percent to various syndicates at Lloyds of London.  The remaining liabilities were ceded 20 percent to General Re, 40 percent to INA Reinsurance Co., and 40 percent to a consortium of Lloyds syndicates and British reinsurance companies.  General Re, Parthenon's principal reinsurer, reviewed Parthenon's claims and other operations on an ongoing basis to ensure that the reinsured business was conducted in accordance with appropriate standards.

During policy years after 1981, General Re and Parthenon entered into an agreement rescinding the reinsurance formerly provided by General Re in the layer $650,000 excess of $350,000, with the result that Parthenon thereafter effectively retained $1 million in liability exposure for its own account until 1986, when the retention was increased to $2 million. Through policy year 1986, Parthenon reinsured its excess exposures in a manner similar to the reinsurance arrangements described above for policy year 1981. Respondent does not dispute deductions for the reinsurance premiums.

Formation of Parthenon Casualty Insurance Company

During 1984, HCA's management decided to form a company to enter into the business of marketing professional liability insurance to physicians who practiced at petitioners' hospitals. Under applicable State law, that insurance could be provided only by an insurance company licensed on an admitted or surplus lines basis in each relevant jurisdiction. That company could not at the same time qualify as a captive insurance company under the Tennessee captive insurance statute. In order to meet the requirements of relevant States that the carriers they admit have a prescribed period of operating history in their domiciliary jurisdiction, HCA decided to use Parthenon (Old Parthenon) as the corporate entity that would qualify as a new surplus lines

company, and to form a new corporation (New Parthenon) to continue to fulfill Parthenon's former captive insurance role.

Accordingly, HCA incorporated New Parthenon during 1984 under the Tennessee captive insurance statute to continue providing captive insurance to petitioners. New Parthenon originally was named Parthenon Casualty Insurance Company, but subsequently changed its name to Parthenon Insurance Company upon beginning operations. During 1985 and subsequent years, New Parthenon issued policies and reinsurance contracts covering the general and professional liability risks of petitioners on the same basis as the old insurance company of the same name and using basically the same staff of employees.

During March 1985, Old Parthenon changed its name to Parthenon Casualty Insurance Company (PCIC), qualified as a licensed surplus lines insurance company in a number of States, and ceased its former role of a pure captive insurance company. The accounting records and account balances for the previously written captive business remained with PCIC, even though its principal activity was to underwrite the professional liability risks of third-party physicians. Additionally, during March 1985, PCIC declared and paid to HCA a dividend in the amount of $2,250,000. HCA contributed that dividend to New Parthenon as paid-in surplus.

During 1985 and subsequent years, PCIC issued policies to individual physicians. The employees of New Parthenon and PCIC during 1985 were basically the same and they continued to service the pre-1985 captive block of insurance, which had continued on PCIC's books after the name change and new underwriting direction. PCIC and New Parthenon entered into an intercompany pooling agreement during 1985 whereby each ceded to and assumed reinsurance from the other, with the end result that risks written by the entities combined were shared on an 85/15 basis.

New Parthenon and PCIC executed a portfolio transfer reinsurance agreement during 1986, to realign each company's portfolio of business to correspond more nearly to the primary business purpose of each company. The net result sought by the portfolio transfer was to place the captive insurance business from the beginning with New Parthenon and the physicians' insurance business from the beginning with PCIC. Effective April 15, 1988, HCA sold all of its shares of PCIC to an unrelated purchaser under an agreement whereby, by executing a reinsurance contract, New Parthenon acquired PCIC's pre-sale physicians' insurance business.

The combined capital and surplus for both New Parthenon and PCIC, where appropriate, for the years 1977 through 1988, is as follows:

| Year | Total Capital and Surplus |
|------|---------------------------|
| 1977 | $2,587,916 |
| 1978 | 2,956,429 |
| 1979 | 5,611,805 |
| 1980 | 7,814,415 |
| 1981 | 10,788,729 |
| 1982 | 23,013,556 |
| 1983 | 29,504,345 |
| 1984 | 38,905,712 |
| 1985 | 47,607,864 |
| 1986 | 60,006,224 |
| 1987 | 85,853,294 |
| 1988 | 102,949,055 |

Hereinafter, we use the term "Parthenon" to refer to the HCA subsidiary providing insurance and reinsurance for petitioners.

During the years in issue, Parthenon did not declare any formal dividends to HCA, other than the $2,250,000 dividend paid to HCA during 1985.

Premium Setting

During the years at issue, Parthenon set the premiums charged by Parthenon for insurance coverage of petitioners from information provided by Parthenon's actuary. Up to and including a portion of policy year 1986, actuarial services regarding premium rates were provided by Wyatt, principally through Eldon Klaassen (Mr. Klaassen), a consulting actuary. For a portion of policy year 1986 and thereafter, actuarial services were provided by Terry J. Biscoglia (Mr. Biscoglia), first as a consulting actuary with Coopers & Lybrand, an international public accounting and consulting firm, and then in the same capacity with Wakely & Associates, a national firm of consulting

actuaries.[8]  For exposures above Parthenon's retained limits, the reinsurers set their own premium requirements.

Premium rates for liability coverages were designed to be applied to an exposure base consisting of licensed beds (after 1981, average occupied beds), emergency room patient visits (for those hospitals choosing emergency room physicians' coverage), and (after 1981) outpatient visits.  The rates to be applied to the exposure base were adjusted to reflect relative risk exposure by geographical area, on the basis of loss information available to the consulting actuary.  Parthenon's rate manuals also contained schedules allowing for the application of debits or credits against the published rates to reflect specific conditions affecting the risk of any particular hospital.

On a quarterly basis, Parthenon's accounting personnel applied the determined rates to the corresponding exposure units from the latest available census of patient information from each hospital and billed HCA for the total premium amount thus determined, and also the premiums attributable to the reinsurance

---

[8]     The parties stipulated that Wyatt Co. (Wyatt) provided actuarial services to Parthenon through policy year 1986 and that Mr. Biscoglia provided actuarial services for policy years after 1986.  Both Mr. Klaassen and Mr. Biscoglia, however, testified that Wyatt was replaced during 1986 and other evidence in the record clearly supports a finding that Mr. Biscoglia provided some actuarial services for Parthenon for a portion of that year. Although we do not lightly disregard the stipulations of the parties, when appropriate, we may do so where the stipulated facts are clearly contrary to facts disclosed by the record. Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).

coverages of risks above Parthenon's retained limits of liability. Final adjustments were made at the end of each year to recalculate the ultimate premium reflected by the actual number of appropriate exposure units.

After receiving bills from Parthenon, HCA generally paid the premium amounts in a timely fashion by check or wire transfer and, using the schedules provided by Parthenon's accounting department described above, charged each hospital its individual premium, determined by application of rates to that hospital's exposure base and adding the hospital's share of the reinsurance premium.

During early 1985, Mr. Klaassen concluded that Parthenon's losses were developing more adversely than originally had been anticipated. Additionally, Parthenon made certain procedural changes to improve its claims reporting process that had the effect of making actuarial predictions temporarily more difficult.

Accordingly, on four occasions during 1985 through 1987, Parthenon's consulting actuary advised Parthenon that its reserves were no longer adequate. Consequently, HCA paid Parthenon payments classified by HCA as additional premiums to fund reserve deficiencies. In each case, the additional amount

(reserve strengthening payment)[9] was collected by Parthenon from
HCA, which in turn used schedules prepared by Parthenon's
accounting department to charge each of the hospitals a pro rata
share of the total additional amount.  A breakdown of the reserve
strengthening payments petitioners paid to Parthenon is as
follows:

| Date Paid | Reserves Strengthened and Amounts Paid | | | |
|---|---|---|---|---|
| | Professional and General | Workers' Compensation | Other | Total |
| 7/29/85 | $11,977,587 | $6,098,709 | – | [1]$18,076,296 |
| 12/9/85 | 12,438,804 | 342,662 | $5,338 | 12,786,804 |
| 4/24/86 | 42,487,000 | – | – | [2]42,487,000 |
| 3/31/87 | 13,000,000 | – | – | 13,000,000 |

[1]Allocated to reserves for years ended 1977 through 1984.
[2]Allocated to reserves for years ended 1982 through 1985.

As of yearend 1985 and 1986, Parthenon recorded additional
amounts of $42.5 million and $13 million, respectively, as

[9]     Use of the term "reserve strengthening" is for convenience
only and should not be construed as a finding that the additional
payments constitute a reserve strengthening within the meaning of
sec. 1023(e)(3)(B) of the Tax Reform Act of 1986 (TRA-1986), Pub.
L. 99-514, 100 Stat. 2404, or within a technical meaning commonly
understood by the insurance industry.  See, e.g., Western Natl.
Mut. Ins. Co. v. Commissioner, supra; Atlantic Mut. Ins. Co. v.
Commissioner, T.C. Memo. 1996-75, revd. 111 F.3d 1056 (3d Cir.
1997); sec. 1.846-3(c), Income Tax Regs.  The parties have
reached an agreement on the computation of the "fresh start"
provisions of sec. 1023(e)(3) of TRA-1986.  Accordingly, we do
not address the conflicting opinions of the Court of Appeals for
the Eighth Circuit in Western Natl. Mut. Ins. Co. v.
Commissioner, supra (rejecting respondent's definition of
"reserve strengthening" as promulgated in sec. 1.846-3, Income
Tax Regs., and accepting our definition), and the Court of
Appeals for the Third Circuit in Atlantic Mut. Ins. Co. v.
Commissioner, supra (upholding the regulatory definition).

premiums receivable for statutory accounting and financial reporting purposes, and recorded corresponding yearend additions to reserves.  Mr. Klaassen considered Parthenon's allocation method to be reasonable from an actuarial standpoint.  Blue Cross found the additional premiums to be reasonable and necessary and allowable for Medicare reimbursement purposes.  The Department of Insurance concluded that the additional amounts collected should be treated as premiums for the business that had been in force and charged Parthenon premium taxes on them accordingly.

During late 1985, Roger E. Mick (Mr. Mick) was appointed senior vice-president and chief financial officer of HCA.  He thought that petitioners' loss experience did not justify the amounts of premiums that Parthenon's consulting actuaries projected were needed to fund its loss reserve requirements.  He believed that petitioners' actual professional liability losses would be much less than the actuaries were predicting.   He thought that the funds petitioners were paying to Parthenon could be used more effectively in other areas of petitioners' core hospital business.

During 1986, Mr. Mick ordered a study be done to consider alternatives to petitioners' purchasing their primary liability insurance coverage from Parthenon.  Petitioners delayed making the quarterly premiums due Parthenon for the 1986 policy year.  Subsequently, Charles L. Kown, Associate General Counsel of HCA

- 35 -

and a board member and Secretary of Parthenon, wrote Parthenon's president on September 11, 1986, and advised that, as an insurance company subject to State regulation, it was critical that Parthenon require premiums to be paid when due.  Petitioners paid the 1986 premiums during late 1986.

Workers' compensation premiums charged petitioners by Ideal Mutual and, subsequently, by Continental, were set under State law by rating bureaus, which are organizations that compile statistical loss information to determine actuarially appropriate premium rates.  By statute in the relevant States, those rates were subject to adjustment on the basis of the actual loss experience of the individual insureds.

Reserve Setting

Hospital professional liability insurance, like other medical malpractice coverages, is relatively "long tailed"; i.e., claims are often not reported until months or years after the occurrence claimed to have resulted in liability.  Because the full extent of liabilities from reported claims may take a long time to develop, reserves against future liabilities constitute the bulk of total incurred losses during the first several years following a policy year.  Incurred but not reported (IBNR) losses account for a significant portion of those reserves.

During the years in issue, Parthenon employed consulting actuaries to assist in determining the appropriate reserves to

record for each of its "accident years"; i.e., calendar years whose associated liabilities would be covered by the policies issued for those years. The actuarial focus was on determining appropriate IBNR reserves. Parthenon's claims personnel set the amounts of case reserves on reported claims.

Typically, reserve adequacy studies would be made by the actuary in the first or second quarter of a year, assessing the adequacy of reserves posted by Parthenon as of December 31 of the previous year. For 1986 and prior years, reserve studies were made under the direction of Mr. Klaassen. For 1986 and later years, reserve studies were made by Mr. Biscoglia.

During late 1984, Parthenon instituted a practice of assigning statistically developed average reserve values to newly opened claims' files pending actual investigation and evaluation of the claim, in contrast to the previous practice of assigning a nominal reserve amount for that interim period. During early 1985, Parthenon's claims department implemented new procedures for increasing the efficiency of loss incident reporting. The acceleration in timing and amount of reported losses caused by those developments raised problems with the actuarial prediction of IBNR losses.

Effective January 1, 1986, the policy issued by Parthenon was a claims made policy, not an occurrence policy as had been the case in prior years. Consequently, Parthenon went from

insuring all losses from occurrences in the policy year to insuring only those losses that resulted in claims made during the year.

During January 1987, Mr. Biscoglia estimated that the general and professional liability reserves needed as of yearend 1986 were in a range between $218 million and $250 million, on an undiscounted basis, and in a range between $176 million and $203 million, on a discounted basis. Subsequently, Mr. Klaassen was asked to give a second opinion regarding the reserves for professional liability losses and loss expenses evaluated as of December 31, 1986, and he recommended reserves for Parthenon and PCIC of approximately $221 million on an undiscounted basis and $182 million on a discounted basis. Mr. Klaassen also suggested an undiscounted value of $259.7 million, or $202.4 million on a discounted basis, if Parthenon wanted an 80 percent probability that the reserve would be adequate. Mr. Klaassen did not know that Parthenon had adopted a claims-made policy for the 1986 policy year. Had he known, the portion of his estimate attributable to the 1986 occurrences would have been reduced by about 65 percent.

During February 1987, Parthenon requested and received permission from the Department of Insurance to reduce the amount of the 1986 reserves for losses and expense payments that it was required to fund by discounting its professional liability

reserves.  Parthenon requested permission to book total reserves of $187,023,000.  That request was supported by actuarial studies prepared by Mr. Klaassen and Mr. Biscoglia, but it was above the amount recommended by Mr. Klaassen and at the lower middle of the range recommended by Mr. Biscoglia.  In a letter addressed to the Tennessee Commissioner of Insurance dated March 27, 1987, Mr. Klaassen certified that the amounts carried on Parthenon balance sheets on account of reserves for unpaid losses and loss adjustment expense for yearend 1986 were computed in accordance with accepted loss reserving standards and were fairly stated in accordance with sound loss reserving principles, were based on factors relevant to policy provisions, met the requirements of the insurance laws of the State of Tennessee, and made good and sufficient provision for all of Parthenon's unpaid loss and loss expense obligations.

The amount of $187,023,000 represented the total of what then already was booked as liability reserves on Parthenon's books, and $13 million that HCA had previously booked as a liability on the consolidated financial statements and agreed to pay Parthenon as additional premium, and was in the range of amounts recommended by its actuaries.  For financial reporting purposes, HCA recorded consolidated reserves for general and hospital professional liabilities as of December 31, 1986, of $120 million over and above the $187 million reserves for the

liabilities recorded as of that date by Parthenon.  That amount was equal to the difference between the low point of the range of ultimate losses of petitioners predicted as of that time by Mr. Biscoglia and the loss amounts recorded on the books of Parthenon at that time.  HCA management considered the $120 million difference as an amount it was required to record for consolidated financial reporting purposes under generally accepted accounting principles, but which Parthenon did not have to record because it represented liabilities that Parthenon did not cover, and consisted of the amount of the discount for investment income that Parthenon was permitted by the Department of Insurance to remove from its reserves and the difference between claims made and occurrence exposure for the 1986 policy year.

Petitioners retained John A. Mackie (Mr. Mackie), a certified public accountant (C.P.A.) who specializes, among other fields, in insurance accounting, to assist petitioners to determine Parthenon's undiscounted reserve amounts for use in Parthenon's 1986 annual statement based on a $187 million discounted general and professional liability reserve.  Mr. Mackie used discount factors to calculate that Parthenon would need an undiscounted reserve of approximately $238 million for unpaid losses and expenses relating to the general and professional liability insurance that it had issued though 1986.

For 1987 and thereafter, the liability policy issued by Parthenon to petitioners was modified to incorporate a $10 million deductible, causing petitioners to be substantially self-insured for general and professional liability risks for policy years after 1986.  Parthenon continued to provide petitioners risk management services and claims administration, and insured high-level excess exposures, but no longer provided insurance for any substantial portion of the day-to-day professional and general liability risks faced by petitioners.  Parthenon continued to provide reinsurance of the workers' compensation risks of petitioners on the same basis as before, with the exceptions that a retrospectively rated feature was added in 1987, and charges to hospitals were made on the basis of actuarial calculations of loss experience beginning in 1988.

As a result of the retrospectively rated premium plan for workers' compensation insurance during policy years 1987 and 1988, Parthenon received a premium installment in the year the policy was issued, followed by a payment in the second year designed, within limits, to cover the losses plus expenses actually incurred.  Parthenon recorded annual statement liabilities during the first year only to the extent that they corresponded with the amount of that year's premium installment, adjusting both premiums and liabilities in the second year to reflect estimated total losses and corresponding premium amounts.

During 1987 and 1988, Parthenon recorded reserves for general and professional liability losses that were higher than the reserves suggested in Mr. Biscoglia's letter reports to Parthenon, while its reserves for workers' compensation liability were lower than the actuary's figures, which reflected his view that all of the anticipated workers' compensation liabilities should have been recorded in the first year. The undiscounted reserve amounts Parthenon reported on its annual statement and the actuary recommended for Parthenon and PCIC for policy years 1987 and 1988 are as follows:

### 1987

|  | Workers' Compensation | General and Professional Liability | Total |
|---|---|---|---|
| Annual Statement | $50,551,000 | $192,397,000 | $242,948,000 |
| Actuary's Recommendation | 67,289,000 | 177,730,000 | 245,019,000 |
| Difference | (16,738,000) | 14,667,000 | (2,071,000) |

### 1988

|  | Workers' Compensation | General and Professional Liability | Total |
|---|---|---|---|
| Annual Statement | $57,417,000 | $172,789,000 | $230,206,000 |
| Actuary's Recommendation | 72,217,000 | 143,731,000 | 215,948,000 |
| Difference | (14,800,000) | 29,058,000 | 14,258,000 |

For policy years 1987 and 1988, Mr. Biscoglia submitted formal reports to HCA setting forth his professional and general liability reserve recommendations for HCA and the sister subsidiaries based on a range of values. Those reserve recommendations included the professional and general liability funded internally by HCA and the sister subsidiaries as well as the professional and general liabilities transferred to Parthenon and PCIC. In those reports, Mr. Biscoglia did not attempt to allocate the reserve recommendations among the various entities. In supplemental addenda for policy years 1987 and 1988, Mr. Biscoglia set forth discounted reserve recommendations for Parthenon and PCIC based on fixed dollar values for the reserves.

Accounting

Parthenon's accounting department recorded and reported the results of Parthenon's insurance operations. Parthenon maintained its own separate accounting system from that of HCA, including its own journals, general and subsidiary ledgers, and other appropriate accounting records. Those records were kept in accordance with HCA's Accounting Manual.

From its inception through November 1986, Parthenon's accounting department prepared monthly financial statements and reports referred to as "management reports." After 1986, no management reports were prepared because the need for the reports ceased.

The Department of Insurance permitted Parthenon to report its results in management report format.  For all years except 1982 and 1983, Parthenon and/or PCIC submitted to the Department of Insurance annual statements in a form prescribed by the National Association of Insurance Commissioners.  The Department of Insurance conducted examinations of the financial condition, affairs, and management of Parthenon during 1979, 1984, and 1989. Each examination report concluded that Parthenon had conducted its operations in conformity with the requirements of the Tennessee captive insurance statute.  The examination report for the period ending December 31, 1979, noted that Parthenon's current policy forms and rates were filed and approved by the Department of Insurance.  From time to time Parthenon consulted with and secured the approval of the Department of Insurance for changes or developments in the conduct of its business, including corporate restructuring to accommodate marketing to individual physicians, additional premium collection to fund reserve deficiencies, and discounting of professional liability reserves for the time-value of money.

Auditing by Medicare Intermediary

During each of the years in issue, Parthenon was audited by Blue Cross/Blue Shield of Tennessee (Blue Cross), as an intermediary acting on behalf of HFCA (or its predecessor agencies) for the purpose of determining whether premiums paid by

petitioners' hospitals qualified for reimbursement under the Federal Medicare program.  To make that determination, Blue Cross was required to confirm that the premiums charged by Parthenon to petitioners were reasonable in light of comparable commercial rates, that both premiums and reserves were based on actuarial determinations, that premiums did not reflect a profit factor, that Parthenon was duly licensed and met appropriate criteria for insurance companies set out by the State of Tennessee, that it had adequate claims administration and adequate risk management, and that there were no loans or transfers of funds from Parthenon to any affiliated company other than payment of covered claims. For each of the years in issue, Blue Cross found that Parthenon met the required criteria. In audit reports issued for those years, Blue Cross specifically confirmed the reasonableness, prudence, and actuarial foundation of the premiums charged by Parthenon, including the additional premiums charged to fund deficiencies in the 1984-86 reserves.

Tax Treatment

Parthenon has been included in the consolidated returns filed by petitioners since it began business during 1977. Because of disagreement between petitioners and respondent as to the proper tax treatment of premiums HCA and the sister subsidiaries paid to Parthenon for earlier tax years petitioners did not claim a deduction for the increase in insurance reserves

relating to premiums received by Parthenon from members of the affiliated group on their consolidated returns for the years in issue.  In the petitions filed in the instant case, petitioners claim that Parthenon is entitled to be treated as an insurance company for the years in issue, that petitioners are entitled to deduct premiums they paid to Parthenon for insurance coverage for those years, and that Parthenon is entitled to deduct the increase in its reserves associated with those premiums, in amounts of premiums not less than the following:

| Year | Professional and General Liability Insurance | Reinsurance of Workers' Compensation Insurance | Total |
|---|---|---|---|
| 1981 | $15,571,167 | $3,404,406 | $18,975,573 |
| 1982 | 21,742,220 | 4,514,782 | 26,257,002 |
| 1983 | 17,630,680 | 5,364,185 | 22,994,865 |
| 1984 | 12,016,909 | 2,598,288 | 14,615,197 |
| 1985 | | | 36,796,826 |
| 1986 | | | 80,247,632 |
| 1987 | | | [1] |
| 1988 | | | [1] |

[1]Specific amounts were not stated in the petitions.

Petitioners claim that overpayments of tax with respect to the transactions with Parthenon result in tax in issue for the years in issue as follows:

| TYE | Increase (Decrease) in Tax |
|---|---|
| 1981 | ($8,703,732) |
| 1982 | (12,247,563) |
| 1983 | (11,520,738) |
| 1984 | (6,128,314) |
| 1985 | (22,228,950) |
| 1986 | (52,934,878) |

| 1987 | 32,602,710 |
| 1988 | 306,593 |
| Total | (80,854,872) |

## OPINION

On a number of prior occasions, this Court has confronted the issue of the deductibility of purported insurance premiums paid to a wholly owned captive insurance company.  E.g., Sears, Roebuck & Co. and Affiliated Corps. v. Commissioner, 96 T.C. 61, modified 96 T.C. 671 (1991), affd. on this issue, revd. in part and remanded 972 F.2d 858 (7th Cir. 1992); Humana Inc. v. Commissioner, 88 T.C. 197 (1987), affd. in part and revd. in part 881 F.2d 247 (6th Cir. 1989); Clougherty Packing Co. v. Commissioner, 84 T.C. 948 (1985), affd. 811 F.2d 1297 (9th Cir. 1987); Carnation Co. v. Commissioner, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981); see also Malone & Hyde, Inc. v. Commissioner, T.C. Memo. 1992-661, revd. and remanded 62 F.3d 835 (6th Cir. 1995).  Our position has been to consider all of the facts and circumstances when faced with the task of determining whether a transaction nominally labeled "insurance" should be recharacterized as "self-insurance" or as some other arrangement that negates transfer of risk.  Sears, Roebuck & Co. v. Commissioner, 96 T.C. at 96; see also Amerco, Inc. v. Commissioner, 979 F.2d 162, 165 (9th Cir. 1992) ("many considerations can come into play when one attempts to decide

whether a deduction of a purported insurance premium will be allowed"), affg. 96 T.C. 18 (1991).  Additionally, we consistently have rejected respondent's "economic family" theory,[10] expressed in Rev. Rul. 77-316, 1977-2 C.B. 53.  E.g., Sears, Roebuck & Co. v. Commissioner, supra; Humana v. Commissioner, 88 T.C. at 214.  We have concluded, moreover, that true insurance arrangements may exist between a captive insurance company subsidiary and its parent, or among a captive insurance company subsidiary and its sister subsidiaries, where the captive insurer does substantial unrelated insurance business in addition to the captive insurance business.  See Sears, Roebuck & Co. v. Commissioner, supra; Harper Group & Subs. v. Commissioner, 96 T.C. 45 (1991); Amerco, Inc. v. Commissioner, 96 T.C. 18 (1991).

The Court of Appeals for the Sixth Circuit, to which the instant case would be appealable absent stipulation to the

---

[10]   Pursuant to the "economic family" theory, a parent cannot shift risk of loss to a wholly owned subsidiary because the parent and its subsidiaries, even though separate corporate entities, represent one economic family.  Consequently, the ultimate economic risk of loss falls on the same persons and the premiums remain within the economic family.  Rev. Rul. 77-316, 1977-2 C.B. 53, 54; see also Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1301-1302 (9th Cir. 1987), affg. 84 T.C. 948 (1985.  But see Rev. Rul. 92-93, 1992-2 C.B. 45 (parent may deduct premiums paid to its wholly owned insurance subsidiary for insurance on the life of an employee of the parent), which distinguishes Rev. Rul 77-316.  "The 'economic family' concept is based on the theory that when a captive receives a dollar, its net worth and its parent's net worth increases by that amount, and that when the captive pays out a dollar the converse occurs." Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1024 n.7 (1987), affd. 914 F.2d 396 (3d Cir. 1990)

- 48 -

contrary, has considered captive insurance company issues on two occasions. See Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835 (6th Cir. 1995), revg. T.C. Memo. 1992-661; Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), affg. in part and revg. in part 88 T.C. 197 (1987). We must follow the rationale of those cases to the extent that the facts presented in them are squarely on point with the facts in the instant case. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

In Humana, Inc. the taxpayer parent, together with various of its subsidiaries, owned and operated between 62 hospitals containing 8,586 beds and 92 hospitals containing 16,529 beds during the years in issue. Humana Inc. v. Commissioner, 88 T.C. at 199. During 1976, Humana incorporated Health Care Indemnity, Inc. (HCI), a Colorado captive insurance company, with $1 million in capitalization, to provide fire, general liability, medical malpractice, and other casualty insurance for Humana and its subsidiaries after Humana learned that it could no longer obtain insurance coverage from a third-party insurer. Id. at 200-202. Of the initial $1 million in capitalization, $750,000 was paid by irrevocable letters of credit issued in favor of the Commissioner of Insurance of the State of Colorado. Id. at 202. No agreements existed between Humana or its subsidiaries and HCI requiring the parent or sister subsidiaries to contribute

additional capital to HCI for the payment of any losses.  Id.
During the last year in issue, however, Humana did contribute
$1,323,000 additional capital to HCI.  Id.  HCI was not included
in the consolidated returns filed by Humana and its subsidiaries.
Id. at 205.  Relying on precedent, we held that the premiums paid
by Humana to HCI on its own behalf as well as the premiums paid
by Humana and then allocated and charged back to the sister
subsidiaries were not deductible but were equivalent to additions
to a reserve for losses.   Id. at 206-207, 213-214.

The Court of Appeals for the Sixth Circuit affirmed our
decision that payments Humana had made to HCI for insurance on
behalf of its own hospitals were not deductible, but reversed our
similar decision as to those payments made on behalf of hospitals
owned by the sister subsidiaries.  Humana Inc. v. Commissioner,
881 F.2d 247 (6th Cir. 1989).  The court concluded that, pursuant
to the principles of Moline Properties, Inc. v. Commissioner, 319
U.S. 436 (1943), the sister subsidiaries must be treated as
separate corporations from the parent.  In its analysis as to
whether risks had shifted to HCI, the Court of Appeals noted
that:

> Health Care Indemnity met the State of Colorado's
> statutory minimum requirements for an insurance company, was
> recognized as an insurance company following an audit and
> certification by the State of Colorado, and is currently a
> valid insurance company subject to the strict regulatory
> control of the Colorado Insurance Department.  The State of
> Colorado has either approved or established the premium rate
> for insurance between the Humana affiliates and Health Care

Indemnity.  As a valid insurance company under Colorado law,
Health Care Indemnity's assets cannot be reached by its
shareholders except in conformity with the statute.

Health Care Indemnity was fully capitalized and no
agreement ever existed under which the subsidiaries or
Humana Inc. would contribute additional capital to Health
Care Indemnity.  The hospital subsidiaries and Humana Inc.
never contributed additional amounts to Health Care
Indemnity nor took any steps to insure Health Care
Indemnity's performance.  It is also undisputed that the
policies purchased by the hospital subsidiaries and Humana
Inc. were insurance policies as commonly understood in the
industry.  The hospital subsidiaries and Humana Inc. entered
into bona fide arms length contracts with Health Care
Indemnity.  Health Care Indemnity was formed for legitimate
business purposes.  Health Care Indemnity and the hospital
subsidiaries conduct legitimate businesses and are devoid of
sham.  No suggestion has been made that the premiums were
overstated or understated.  Health Care Indemnity did not
file its income tax returns on a consolidated basis with
Humana Inc. and its subsidiaries.  Humana Inc.'s insured
subsidiaries own no stock in Health Care Indemnity, nor vice
versa.  [Humana, Inc. v. Commissioner, 881 F.2d at 253;
citation omitted.]

The Court of Appeals specifically adopted the balance sheet

and net worth analysis described in Clougherty Packing Co. v.

Commissioner, 811 F.2d at 1305,[11] to analyze whether risks had

---

[11]     In Clougherty Packing Co. v. Commissioner, 811 F.2d 1297
(9th Cir. 1987), affg. 84 T.C. 948 (1985), the taxpayer parent
incorporated a Colorado captive insurance company to reinsure a
portion of the workers' compensation risks primarily insured by a
third party insurance carrier.  In affirming our decision that
risks had not shifted to the captive insurer, the Court of
Appeals for the Ninth Circuit neither adopted nor rejected
respondent's economic family concept, stating as follows:

In reaching our holding, we do not disturb the
separate legal status of the various corporate entities
involved, either by treating them as a single unit or
otherwise.  Rather, we examine the economic
consequences of the captive insurance arrangement to
                                        (continued...)

shifted from the sister subsidiaries to HCI. The court stated
that "If we look solely to the insured's assets, i.e., those of
the various affiliates of Humana Inc., and consider only the
effect of a claim on those assets, it is clear that the risk of
loss has shifted from the various affiliates to Health Care
Indemnity." Humana Inc. v. Commissioner, 881 F.2d at 252. The
court explained as follows:

> The economic reality of insurance between a parent and a
> captive insurance company is that the captive's stock is
> shown as an asset on the parent's balance sheet. If the
> parent suffers an insured loss which the captive has to pay,
> the assets of the captive will be depleted by the amount of
> the payment. This will reduce the value of the captive's
> shares as an asset of the parent. In effect, the assets of
> the parent bear the true economic impact of the loss. The
> economic reality, however, of insurance between the Humana
> subsidiaries and Health Care Indemnity, where the
> subsidiaries own no stock in the captive and vice versa, is
> that when a loss occurs and is paid by Health Care Indemnity
> the net worth of the Humana affiliates is not reduced
> accordingly. The subsidiaries' balance sheets and net worth
> are not affected by the payment of an insured claim by
> Health Care Indemnity. In reality, therefore, when the
> Humana subsidiaries pay their own premiums under their own
> insurance contracts, as the facts show, they shift their
> risk to Health Care Indemnity. [Id. at 253.]

---

11 (...continued)
the "insured" party to see if that party has, in fact,
shifted the risk. In doing so, we look only to the
insured's assets, i.e., those of Clougherty, to
determine whether it has divested itself of the adverse
economic consequences of a covered workers'
compensation claim. Viewing only Clougherty's assets
and considering only the effect of a claim on those
assets, it is clear that the risk of loss has not been
shifted from Clougherty. [Id. at 1305; emphasis
added.]

Distinguishing the cases relied on by the Commissioner,[12] the Court of Appeals stated further that the undercapitalization of the captive insurer or the presence of an indemnification agreement running from the parent to the captive insurer "alone provided a sufficient basis from which to find no risk shifting and to decide the cases in favor of the Commissioner." Humana v. Commissioner, 881 F.2d at 254 n.2.

The Court of Appeals also stated:

> In general, absent specific congressional intent to the contrary, as is the situation in this case, a court cannot disregard a transaction in the name of economic reality and substance over form absent a finding of sham or lack of business purpose under the relevant tax statute. [Id. at 255; citations omitted.]

The court noted that we had found that Humana had a valid business purpose for incorporating the captive insurer. Id. The court found both risk sharing and risk distribution involved in the transactions between the Humana subsidiaries and HCI. Id. Risk distribution was involved because losses were spread among a number of Humana's subsidiaries. Id. at 257.

In Malone & Hyde, Inc. v. Commissioner, T.C. Memo. 1989-604, supplemented by T.C. Memo. 1993-585, the taxpayer parent, primarily a wholesale food distributor, together with

---

[12] Those cases were: Beech Aircraft Corp. v. United States, 797 F.2d 920 (10th Cir. 1986); Stearns-Roger Corp. v. United States, 774 F.2d 414 (10 Cir. 1985); Carnation Co. v. Commissioner, 71 T.C. 400 (1978), affd. 640 F.2d 1010 (9th Cir. 1981).

approximately eight operating subsidiaries provided goods and services required by their independent retail grocery store owner customers. During 1977, Malone & Hyde incorporated Eastland Insurance, Ltd. (Eastland) as a wholly owned Bermuda captive insurance company to provide insurance for itself and its subsidiaries at less cost than was available from third-party insurers. Eastland was capitalized at $120,000, the minimum statutory requirement pursuant to Bermuda's insurance law. Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 836. Malone & Hyde decided that initially Eastland only would reinsure selected risks of the parent and the subsidiaries. Accordingly, Eastland agreed to reinsure the first $150,000 of each workers' compensation, auto liability, and general liability claim primarily insured by Northwestern National Insurance Co. (Northwestern). Eastland provided Northwestern with an irrevocable letter of credit, initially in the amount of $250,000 but subsequently increased to $600,000, to cover amounts unpaid under the reinsurance agreement. Additionally, Malone & Hyde executed hold harmless agreements wherein it agreed to indemnify Northwestern against any liability in the event that Eastland defaulted on its reinsurance obligations. Malone & Hyde paid insurance premiums to Northwestern and Northwestern in turn paid Eastland reinsurance premiums for the insurance risks assumed by Eastland. Malone & Hyde allocated to the operating subsidiaries

their portion of the premiums paid to Northwestern.  Malone & Hyde, Inc. v. Commissioner, T.C. Memo. 1989-604.

In our first opinion in Malone & Hyde, Inc., we sustained respondent's determination that there was no shifting of risks from the parent and the sister subsidiaries to Eastland for the portion of the insurance premiums that Malone & Hyde paid to Northwestern and which Northwestern then paid to Eastland as reinsurance premiums.  Malone & Hyde, Inc. v. Commissioner, T.C. Memo. 1989-604.  Following the reversal of Humana Inc. & Subs. v. Commissioner, 88 T.C. 197 (1987), we reconsidered our first decision in Malone & Hyde, Inc. in light of language in Humana Inc. v. Commissioner, 881 F.2d at 255, that in applying the balance sheet and net worth analysis we look solely at the impact a claim of loss would have on the assets of the insured.  In our Supplemental Opinion in Malone & Hyde, Inc., using that criteria, and applying our three-prong test (i.e., (1) whether insurance risks are involved, (2) whether risk shifting and risk distribution is present, and (3) whether insurance in its commonly accepted sense exists), we found that the premiums paid by the sister subsidiaries were deductible as insurance.  Malone & Hyde, Inc. v. Commissioner, T.C. Memo. 1993-585.

The Court of Appeals for the Sixth Circuit reversed our decision.  The court stated:

> We believe the tax court put the cart before the horse in this case.  It should have determined first whether

Malone & Hyde created Eastland for a legitimate business purpose or whether the captive was in fact a sham corporation. A taxpayer is "free to arrange his financial affairs to minimize his tax liability." Thus, "the presence of tax avoidance motives will not nullify an otherwise bona fide transaction." However, the establishment of a tax deduction is not, in and of itself, an "otherwise bona fide transaction" if the deduction is accomplished through the use of an undercapitalized foreign insurance captive that is propped-up by guarantees of the parent corporation. The captive in such a case is essentially a sham corporation, and the payments to such a captive that are designated as insurance premiums do not constitute bona fide business expenses, entitling the taxpayer to a deduction under § 162(a). [Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 840; citations omitted.]

The court noted that Malone & Hyde did not have any problem obtaining insurance from an unrelated insurer but, without a legitimate business reason, it had deviated from normal behavior and had devised a circuitous scheme to obtain tax deductions through the use of a captive insurer. Id. The court also observed that there was no indication that Bermuda exercised oversight over Eastland's activities. Id. at 841. The court further noted that Eastland operated on extremely thin capitalization and that Malone & Hyde had furnished Northwestern with hold harmless agreements on two occasions. The court stated that the presence of the hold harmless agreements and undercapitalization (two factors which had been identified in Humana Inc. v. Commissioner, 881 F.2d at 254 n.2, as weaknesses that in themselves provided a sufficient basis on which to find no risk shifting) "indicates that the captive insurance scheme established by Malone & Hyde was not an 'otherwise bona fide

transaction,' but a sham."  Malone & Hyde, Inc. v. Commissioner,

62 F.3d at 841.

The Court of Appeals stated:

If Humana's scheme had involved a thinly-capitalized captive foreign insurance company that ended up with a large portion of the premiums paid to a commercial insurance company as primary insurer, and had included a hold harmless agreement from Humana indemnifying the unrelated insurer against all liability, we believe the result in Humana would have been different.  This court accepted the bona fides of the transaction in Humana and recognized the premiums paid to the captive insurance company as deductible business expenses since Humana established the captive to address a legitimate business concern (the loss of insurance coverage), and the captive was not a sham corporation; the captive in Humana was fully capitalized, domestically incorporated, and established without guarantees from the parent or other related corporations.  Because Humana acted in a straightforward manner, without any evidence of an intent to create an unwarranted tax deduction based on payments that largely ended up in its subsidiary's coffers, this court accepted the bona fides of the transaction before examining the brother-sister issue.

We disagree with Malone & Hyde's contention that footnote 2 in Humana refers only to the question of whether Humana's premium payments for its own coverage, as opposed to the coverage extended its subsidiaries, involved risk shifting.  Footnote 2 clearly applies to the fundamental and decisive question of whether there was risk shifting from any insured--parent or subsidiary--to the captive insurer.  When the entire scheme involves either undercapitalization or indemnification of the primary insurer by the taxpayer claiming the deduction, or both, these facts alone disqualify the premium payments from being treated as ordinary and necessary business expenses to the extent such payments are ceded by the primary insurer to the captive insurance subsidiary.

It is true that Eastland operated as an insurance company.  As the tax court found, it "established reserve accounts, paid claimed losses only after the validity of those claims had been established, and was profitable."  For purposes of determining the correct tax treatment of premiums paid to Eastland by Malone & Hyde, however, we

cannot be blind to the realities of the case. The
"interdependent" separate agreements, when considered
together indicate an arrangement under which there was no
risk shifting. Under the hold harmless agreement, the
ultimate risk for workers' compensation, auto liability, and
general liability remained with Malone & Hyde. This being
so, the transactions did not result in Malone & Hyde or the
subsidiaries receiving "insurance" from Eastland within the
meaning of that term under the Internal Revenue Code.
[Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 842-843;
citations omitted; emphasis added.]

We turn next to our consideration of the facts present in
the instant case in light of the holdings of the Sixth Circuit
Court of Appeals in Humana and Malone & Hyde, Inc.. Golsen v.
Commissioner, 54 T.C. 742 (1970). In the instant case,
respondent concedes that the professional and general liability
risks and workers' compensation risks covered by Parthenon are
insurable risks. Furthermore, respondent does not dispute the
presence of risk distribution in the instant case, inasmuch as
the number of hospitals insured and the number of hospital beds
involved in the instant case far exceed the number of hospitals
and beds insured that the Court of Appeals in Humana found
sufficient for risk distribution to have occurred. Humana Inc.
v. Commissioner, 881 F.2d at 256-257. Accordingly, the questions
we must resolve are (1) whether bona fide insurance transactions
exist and, (2) if they do, whether the sister subsidiaries
shifted those risks to Parthenon.

The Transactions Between Parthenon and HCA and the Sister
Subsidiaries Are Insurance Transactions

Pursuant to the principles of Moline Properties, Inc. v.
Commissioner, 319 U.S. 436 (1943), respondent does not contend
that Parthenon's separate corporate existence should be ignored
for Federal income tax purposes or that Parthenon itself is a
sham corporation.  Respondent contends, however, that the
transactions between Parthenon and petitioners during the years
in issue, including the issuance of insurance policies and
setting of reserves, were not bona fide insurance transactions
and were motivated by tax concerns.

Respondent contends that petitioners intended to, and did,
treat Parthenon as a form of self-insurance to carry out a loss
prevention and risk management program for their hospitals.
Respondent concedes that Parthenon was licensed and regulated as
a captive insurance company by the State of Tennessee, and that
it satisfied the applicable regulatory criteria for operation as
a captive insurer.  Respondent, however, maintains that the
regulatory criteria, as well as Blue Cross' annual audits and
Continental's annual reviews, were no more than what would be
necessary for a self-insurance plan.  Respondent contends that
petitioners formed Parthenon as a captive insurance company in

- 59 -

order to create tax deductions for amounts that in fact are self-insurance.

Petitioners contend that the transactions were in respect of an insurance company and that respondent's self-insurance argument is an attempt to recharacterize an insurance relationship between separate legal entities as self-insurance by a single economic family.

In the instant case, Parthenon, in form, operated as an insurance company.  It was licensed as a captive insurer, fully staffed, and performed typical insurance functions, including underwriting, the setting of premiums and reserves, investment management, and claims administration.  Nonetheless, we must look beyond the formalities and consider the realities of the purported insurance transactions between Parthenon and petitioners.  Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 842-843.  Based on the record developed in the instant case, we conclude that Parthenon provided insurance to HCA and to the sister subsidiaries.

Respondent asserts the following differences to distinguish the instant case from Humana, Inc. v. Commissioner, supra:  (1) The sister subsidiaries, in effect, were stockholders in Parthenon; (2) Parthenon was not subject to strict regulatory

control by the Department of Insurance; (3) approval of the rates between Parthenon and its sister subsidiaries, and protection of Parthenon's assets, was not accomplished on an annual basis by the State of Tennessee; (4) there was an agreement by which the sister subsidiaries or HCA would contribute additional capital to Parthenon; (5) HCA's hospital subsidiaries contributed additional amounts to Parthenon; (6) the insurance policies that Parthenon issued to the sister subsidiaries did not constitute bona fide insurance contracts as commonly understood in the insurance industry; (7) HCA's hospital subsidiaries as corporate entities did not operate the individual hospitals; (8) the premiums were both overstated (for 1986, 1987, and 1988) and understated (for 1984) at the whim of HCA based on HCA's needs at the time the premiums were determined; and (9) Parthenon filed its income tax return on a consolidated basis with HCA and its subsidiaries but not on the insurance company forms required by the income tax regulations. Accordingly, respondent contends that Humana, Inc. v. Commissioner, supra, does not control the outcome of the instant case because the facts are distinguishable.

Respondent contends further that HCA's decision during 1985 to use the assets and reserves of Parthenon to organize a surplus lines company to provide medical malpractice insurance to

physicians who referred patients to HCA hospitals, the payment of additional premiums for prior years during 1986 while failing to pay current premiums, and the decision during 1987 to raise HCA's and the sister subsidiaries' general and professional liability insurance deductible to $10 million and thereby effectively terminate Parthenon's premium income demonstrate that Parthenon was controlled at all times by HCA for the benefit of HCA. Additionally, respondent contends that the comfort letter given by HCA to Ideal Mutual to guarantee the performance of Parthenon, the payment of workers' compensation claims in 1984 by HCA in connection with its Florida hospitals upon the insolvency of Ideal Mutual, the transfer of Parthenon's reserves to PCIC, the reserve strengthening payments totaling $86 million, an alleged $60 million excessive premium charged for the 1986 claims-made policy at the rate for a policy on an occurrence basis, the failure of HCA to pay the quarterly premiums for the first three quarters of 1986, and the decision by HCA during 1987 to pay claims less than $10 million out of working capital, all support the conclusion that neither HCA nor the sister subsidiaries shifted risks to Parthenon.

Petitioners contend, however, that the facts in the instant case are similar to those in Humana, Inc. v. Commissioner, supra.

Petitioners contend that they established Parthenon to address a legitimate business concern, that petitioners acted in a straightforward manner, with no intent to create an unwarranted tax deduction, and that Parthenon was fully capitalized, domestically incorporated, regulated by the State, and was not propped up by guaranties from HCA or the sister subsidiaries. Petitioners contend further that Parthenon did not act solely as a reinsurer of risks but directly insured the general and professional liability risks of HCA and the sister subsidiaries.

Additionally, petitioners contend that the comfort letter HCA gave to Ideal Mutual was a normal kind of reinsurance security arrangement that had no effect on risk transfer. Petitioners contend that the comfort letter HCA gave to Ideal Mutual affected only a modest portion of Parthenon's business and was not in effect when Continental became the commercial carrier for the workers' compensation insurance during 1984 following Ideal Mutual's insolvency. Accordingly, petitioners maintain, the comfort letter did not "prop up" Parthenon. Additionally, petitioners contend that the indemnity provision of the agreement between HCA and Continental is not relevant to the reinsurance provided by Parthenon because the subject matter of the indemnity

agreement was risks that were not covered by the reinsured policies.

We conclude that, with a few significant differences, the facts of the instant case are strikingly similar to the facts presented in Humana Inc. v. Commissioner, supra. Both Humana and HCA owned and operated hospitals that were facing difficulties in obtaining medical malpractice insurance at the time that they formed their captive insurance companies. Both formed fully capitalized, domestic captive insurance companies to provide on a direct basis general and professional liability insurance for themselves and their operating subsidiaries. Respondent does not dispute that Parthenon was formed and operated for legitimate business purposes.

Except as discussed infra, we are not persuaded that the "distinctions" between the facts of Humana and those of the instant case are material. Respondent contends that the sister subsidiaries had an equity interest in Parthenon. We do not agree. We are not persuaded that the reserve strengthening payments HCA and the sister subsidiaries paid to Parthenon during 1985, 1986, and 1987, or an alleged $60 million overcharge paid for 1986, were the equivalent of capital contributions, which, in substance, gave the sister subsidiaries an ownership interest in

Parthenon.  Neither Parthenon nor the sister subsidiaries intended to or did treat the reserve strengthening payments as equity investment.  Additionally, both the Department of Insurance and Blue Cross treated the reserve strengthening payments as insurance premiums.  We conclude that, in fact and in substance, the sister subsidiaries did not own any of Parthenon's stock.

Respondent contends further that the Department of Insurance did not strictly regulate Parthenon.  The record in the instant case establishes that the Tennessee Department of Insurance did not promise, and we are persuaded that it did not extend special privileges to Parthenon.  The supervision that the Department of Insurance exercised over Parthenon's operations, including periodic financial examinations, was no different from the supervision exercised over any other captive insurer licensed in the State of Tennessee.  Although the Department of Insurance did not annually establish or approve the premium rates between Parthenon and its sister subsidiaries, the examination report of Parthenon prepared by the Department of Insurance as of December 31, 1979, indicates that the basic premium rating process used by Parthenon for that period had the approval of the Department of Insurance.  Parthenon's process for setting premium rates did not

change significantly during the years in issue from the process used during 1979. Annual approval of Parthenon's premium rates is not required by the Tennessee captive insurance statute. Furthermore, contrary to respondent's contention, there is no indication that HCA used or could use Parthenon's assets except in conformity with the Tennessee captive insurance statute.

Respondent contends that, from its inception, HCA agreed to contribute additional capital to Parthenon. Neither HCA nor the sister subsidiaries, however, agreed to, nor did the Department of Insurance require HCA or the sister subsidiaries to agree to be responsible for, any losses of Parthenon when Parthenon was reincorporated in Tennessee during 1979. Although the Department of Insurance, and HCA's management, may have expected HCA to provide financial help if Parthenon were to experience financial difficulties, there was no legal requirement or binding agreement that HCA or the sister subsidiaries do so.

Respondent contends that the sister subsidiaries' lack of choice as to insurer or insurance coverage demonstrates that the insurance policies purchased by HCA and the sister subsidiaries from Parthenon were not insurance policies as commonly understood in the industry and that those policies were not entered into as bona fide arm's-length contracts by the subsidiaries. Respondent

therefore argues that the transactions between Parthenon and petitioners were in the nature of self-insurance.  We are unable to reach such a conclusion and, furthermore, are persuaded that the lack of choice plays no role in deciding whether the policies between Parthenon and its sister subsidiaries constituted insurance as commonly understood in the industry.  The policies covered typical insurance risks, including medical malpractice, property damages, and workers' compensation liability.  HCA, moreover, had a legitimate business reason for requiring the sister subsidiaries to acquire insurance from Parthenon.

Additionally, we find no merit to respondent's contention that the sister subsidiaries merely held legal title to the hospitals they owned and therefore played no part in the insurance relationship between Parthenon and those hospitals. Respondent's position would have us, in effect, ignore the separate existence of the sister subsidiaries even though respondent agrees that they were formed and operated for legitimate business purposes and should be recognized as separate corporate entities.  We find no basis in fact or law for doing so.  See Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).

Nonetheless, we agree that some significant factual distinctions exist between the present case and Humana, Inc. v. Commissioner, supra. We next consider the effect of those differences.

One significant factual distinction between the instant case and Humana is the presence of the comfort letter that HCA gave to Ideal Mutual whereby HCA agreed to indemnify Ideal Mutual against Parthenon's nonperformance relating to workers' compensation liabilities that Ideal Mutual reinsured with Parthenon. Humana had taken no steps to insure HCI's performance. Humana Inc. v. Commissioner, 881 F.2d at 253. Malone & Hyde, however, gave Northwestern, the insurance company primarily liable for insurance risks reinsured by Eastland, a hold harmless agreement relating to Eastland's reinsurance obligations. Malone & Hyde, Inc. v. Commissioner, 62 F.3d at 836.

In Malone & Hyde, Inc., the Court of Appeals stated that the presence of the hold harmless agreement, along with the fact that Eastland was undercapitalized, indicated that the captive insurance arrangement was a sham. Id. at 841. Eastland's activities, however, were limited to providing reinsurance for risks primarily insured by Northwestern, and the indemnity agreement applied to all of those reinsured risks. In the

instant case, the comfort letter applied to only one line of business, and that line of business was not the primary insurance coverage provided by Parthenon to HCA and the sister subsidiaries. Parthenon insured, on a direct basis, general and professional liabilities for which no indemnity agreement was in effect. The comfort letter, furthermore, was not in effect after Ideal Mutual's insolvency during 1984. The indemnity agreement between HCA and Continental related to liabilities arising from the agreement to cede insurance obligations that HCA had entered into with the Superintendent of Insurance of the State of New York as Rehabilitator of Ideal Mutual Insurance Co., but it specifically excluded Continental's own obligations under its policies. Accordingly, the indemnity agreement was restricted to obligations relating to Ideal Mutual's policies, and it did not involve Continental's own policies. Under such circumstances, we conclude that in the instant case the successive indemnity agreements between HCA and Ideal Mutual and between HCA and Continental are not a sufficient basis for finding that the transactions between Parthenon and the sister subsidiaries were not bona fide.[13]

_____

[13] In accordance with <u>Malone & Hyde, Inc. v. Commissioner</u>, 62 F.3d 835 (6th Cir. 1995), however, risk shifting is absent for
(continued...)

An additional distinction between the instant case and Humana, Inc. v. Commissioner, supra, is that on four separate occasions during the years in issue HCA and the sister subsidiaries made reserve strengthening payments to Parthenon totaling in the aggregate $86,350,100. Respondent contends that the reserve strengthening payments and a payment by HCA relating to Florida hospital workers' compensation claims when Ideal Mutual became insolvent show that the ultimate responsibility for insurance coverage provided by Parthenon remained with HCA. We agree that those are factors to consider but conclude they are not dispositive of the instant case.

HCA and the sister subsidiaries made the reserve strengthening payments following determinations by Parthenon's consulting actuary that Parthenon's reserves were not adequate because its losses were developing more adversely than originally estimated. The payments were treated as insurance premiums not only by petitioners but also by the Department of Insurance and by Blue Cross acting in its capacity as intermediary for HCFA. The need for the additional payments arose not because Parthenon

---

13 (...continued)
Parthenon's workers' compensation obligations to the extent and during the time that the indemnity agreement with Ideal Mutual was in effect.

was thinly capitalized, but because, when the reserve strengthening payments were made, earlier actuarial projections made by Parthenon's independent consulting actuaries of unpaid losses appeared insufficient to cover all of those losses. Under the circumstances, we conclude that HCA and the sister subsidiaries made the reserve strengthening payments to secure insurance protection and that the fact of such payments does not require a conclusion that the insurance arrangement with Parthenon was a sham. Additionally, we believe that HCA's decision to pay the Florida workers' compensation claims rather than having the hospitals' assets frozen by the State of Florida was a sound business decision relating to the continued operations of those hospitals, and not evidence of a sham arrangement with Parthenon.

Respondent contends further that the premiums for the 1986, 1987, and 1988 policy years were understated while the premium for the 1984 policy year was overstated. Respondent relies on Mr. Merlino's opinion to support that contention. Petitioners contend that their independent actuarial consultants recommended the premiums based on estimates of the risks assumed by Parthenon. Petitioners contend that whether the actuarial calculations produced premiums that proved to be higher or lower

than the losses actually incurred does not mean that the actuarial opinions were wrong or misstatements of the premium amounts. The premiums were neither subject to change at the whim of HCA or its officers nor calculated so as to give petitioners an unwarranted tax advantage. Accordingly, assuming arguendo that the premiums were understated for 1984 or overstated for 1986, 1987, or 1988, we conclude that in the instant case the understatement and overstatements would not render the insurance arrangement between Parthenon and HCA and the sister subsidiaries a sham.

Another distinction between Humana and the instant case is that HCI filed a separate return from Humana and the sister subsidiaries while in the instant case Parthenon filed its return on a consolidated basis with HCA and the sister subsidiaries. Although filing a consolidated return may be a factor to consider in analyzing whether a transaction is bona fide, we do not find the factor conclusive as to respondent's contention that the arrangement in the instant case was a sham. A consolidated income tax return treats members of the affiliated group as a single entity for some purposes and as separate entities for other purposes. 1 Lerner et al., Federal Income Taxation of Corporations Filing Consolidated Returns 6-1 to 6-2 (1996). The

consolidated return regulations in effect for the years in issue calculate income of each corporation in an affiliated group separately as a threshold matter and for that purpose treat each member of a consolidated return as a separate corporation. 1 Peel, 1 Consolidated Tax Returns sec. 1:01, at 1-2 (3d ed. 1992). In that respect the tax treatment of insurance premiums is reflected on a separate basis, not on a consolidated basis. HCA, moreover, operated Parthenon as a separate entity. It was separately staffed and managed. It maintained its own personnel files, accounting records, information management system, cash management system, and banking arrangements.

The consolidated return regulations require that a parent's basis in the stock of its subsidiary be adjusted on the basis of the subsidiary's earnings and profits. CSI Hydrostatic Testers, Inc. v. Commissioner, 103 T.C. 398, 404 (1994), affd. 62 F.3d 136 (5th Cir. 1995). Pursuant to section 1.1502-32(b)(1)(ii), Income Tax Regs., a positive basis adjustment is to be made in an amount equal to an allocable part of the undistributed earnings and profits of a subsidiary for the taxable year. CSI Hydrostatic Testers, Inc. v. Commissioner, supra at 410. The net positive or negative adjustment only affects HCA, however, inasmuch as it is Parthenon's sole stockholder. The basis adjustment does not

affect the existence of Parthenon as a separate corporate entity. Accordingly, we conclude that the fact that Parthenon filed on the consolidated return with HCA and the sister subsidiaries does not render the insurance arrangement between Parthenon and HCA and the sister subsidiaries a sham.

Additionally, respondent further contends that HCA's use of a $2,250,000 dividend from Parthenon to effectuate the formation of PCIC, the failure of HCA and the sister subsidiaries to timely pay quarterly premiums for the 1986 policy year, and the calculation of the premium for the 1986 claims-made policy on the rate for an occurrence basis policy, show that Parthenon was controlled at all times by HCA for HCA's benefit and support a conclusion that the insurance arrangement between Parthenon and HCA and the sister subsidiaries was a sham. Although those events are factors to consider, we do not find them dispositive. Respondent does not contend that payment of the dividend to HCA or its use in forming a surplus lines insurance company was prohibited by statute or regulation. HCA formed PCIC because, as a captive insurer, Parthenon could not provide medical malpractice insurance to unrelated parties. HCA and the sister subsidiaries delayed payment of the 1986 quarterly premiums while HCA management reconsidered its insurance objectives. The 1986

premium was calculated on an occurrence policy basis to increase Parthenon's reserves. There is no evidence that decisions to pay the dividend, establish PCIC, delay payment of the 1986 quarterly premiums, or calculate the 1986 premium using an occurrence policy basis were tax motivated.

Accordingly, considering all of the facts and circumstances presented in the instant case, we conclude that the transactions between Parthenon and HCA and the sister subsidiaries constituted a bona fide insurance arrangement.

The Sister Subsidiaries Shifted Risks to Parthenon

Under the rationale of Humana Inc. v. Commissioner, 881 F.2d 247 (6th Cir. 1989), petitioners do not contend that HCA shifted its own insurance risks to Parthenon. Petitioners do contend, however, that the sister subsidiaries shifted their insurance risks to Parthenon. Respondent contends that no risk shifting occurred.

Petitioners contend that, pursuant to Humana, the economic impact of loss payments on the assets of the insured must be analyzed to determine whether risks have shifted. Petitioners contend that in the instant case, when losses occurred and were paid by Parthenon, the sister subsidiaries' balance sheets and net worth were unaffected by the payment. Accordingly,

- 75 -

petitioners contend, the sister subsidiaries' premium payments shifted their risks to Parthenon.  We agree.  Under the balance sheet and net worth analysis adopted by the Court of Appeals for the Sixth Circuit in Humana Inc. v. Commissioner, supra, the sister subsidiaries shifted insurance risks to Parthenon, except for the workers' compensation liability covered by the indemnification agreement between HCA and Ideal Mutual.  Pursuant to Malone & Hyde, Inc. v. Commissioner, 62 F.3d 835 (6th Cir. 1995), there is no risk shifting of the workers' compensation liability that was subject to the indemnification agreement between HCA and Ideal Mutual, and, consequently, any addition to the workers' compensation reserves attributable to the Ideal Mutual policies is not deductible.

Accordingly, we conclude that Parthenon provided insurance for the sister subsidiaries for the years in issue and, thus, functioned as an insurance company.  Sec. 816(a); see also sec. 1.801-3(a)(1), Income Tax Regs.

The second issue we must decide is what portion of Parthenon's reserves for unpaid losses and expenses is deductible for the years in issue.  The parties have agreed as to all adjustments relating to Parthenon's unpaid losses reserves except the question of whether any or all of the adjustments set out in

the report of respondent's expert, Mr. Merlino, should be made. Should we decide that a portion, but not all, of the reserve adjustments proposed by Mr. Merlino should be made, the parties have agreed upon a methodology for computing the resulting adjustments to income.

Section 831 imposes taxes computed as provided in section 11 on the taxable income of insurance companies other than life insurance companies.[14] Section 832(c) provides deductions for purposes of computing the taxable income of an insurance company, inter alia, for all ordinary and necessary expenses incurred and for losses incurred. Sec. 832(c)(1), (4).[15] Section 832(b)(5)[16] defines "losses incurred" as an amount equal

---

[14] For taxable years beginning prior to Jan. 1, 1987, sec. 831 imposed tax as provided in sec. 11 on insurance companies other than life insurance companies and mutual insurance companies.

[15] Sec. 832(c) provides in pertinent part as follows:

(c) DEDUCTIONS ALLOWED.--In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

(1) all ordinary and necessary expenses incurred, as provided in section 162 (relating to trade or business expenses);
*     *     *     *     *     *     *
(4) losses incurred, as defined in subsection (b)(5) of this section;

[16] For tax year ended 1986, sec. 832(b)(5) provides as follows:
(continued...)

to (1) the losses paid during the taxable year, (2) reduced by salvage and reinsurance recovered during that year, (3) plus all unpaid losses (discounted for years after 1986) outstanding at

---

[16] (...continued)

(5) LOSSES INCURRED.--The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

For tax years ended 1987 and 1988, section 832(b)(5)(A) provides as follows:

(5)LOSSES INCURRED.--

(A)  In general.--The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(i) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.
(ii) To the result so obtained, add all unpaid losses on life insurance contracts plus all discounted unpaid losses (as defined in section 846) outstanding at the end of the taxable year and deduct unpaid losses on life insurance contracts plus all discounted unpaid losses outstanding at the end of the preceding taxable year.

the end of the taxable year, (4) less all unpaid losses outstanding at the end of the preceding taxable year, (5) plus estimated salvage and reinsurance recoverable at the end of the preceding taxable year, (6) less estimated salvage and reinsurance recoverable at the end of the taxable year. The portion of "losses incurred" that represents unpaid losses must comprise only actual unpaid losses as nearly as it is possible to ascertain them. Sec. 1.832-4(b), Income Tax Regs.[17] The estimate of actual outstanding unpaid losses must be fair and reasonable based on the facts in each case and the company's experience with similar cases. Id.

---

[17] Sec. 1.832-4(b), Income Tax Regs., provides as follows:

(b) Losses incurred. Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses. See Section 846 for rules relating to the determination of discounted unpaid losses. These losses must be stated in amounts which, based upon the facts in each case and the company's experience with similar cases, represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of unpaid losses which, in the opinion of the district director, are in excess of a fair and reasonable estimate will be disallowed as a deduction. The district director may require any insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred."

The reserve for unpaid losses at the end of the taxable year is an estimate, made at the close of the current taxable year, of the insurer's liability for claims that it will be required to pay in future years.  Home Mutual Ins. Co. v. Commissioner, 70 T.C. 944, 951 (1978), affd. in part, revd. in part and remanded 639 F.2d 333 (7th Cir. 1980); Western Casualty & Surety Co. v. Commissioner, 65 T.C. 897, 917 (1976), affd. on another issue 571 F.2d 514 (10th Cir. 1978).  The unpaid loss reserve at the end of the taxable year for purposes of computing the "losses incurred" deduction consists of the aggregate unpaid loss reserves for all lines of business of the insurance company.  Hanover Ins. Co. v. Commissioner, 69 T.C. 260, 271 (1977), affd. 598 F.2d 1211 (1st Cir. 1979); Western Casualty Surety Co. v. Commissioner, supra at 917.[18]  The resolution of a fair and reasonable estimate of a taxpayer's unpaid losses is essentially a valuation issue and a question of fact.  Hanover Ins. Co. v. Commissioner, supra at 270.  Calculation of unpaid losses may not be based on estimates of potential losses that might be incurred in future years.

_____

[18]    See also Rev. Proc. 75-56, 1975-2 C.B. 596, 597, sec. 3.03 (the deduction for unpaid losses incurred shall be the aggregate of the reasonable estimates for each line of business at the end of each taxable year).  Rev. Proc. 75-56 sets forth procedures for computing the deduction for losses incurred pursuant to sec. 832(b)(5).

Rather, unpaid losses must be based on the actual loss experience of the insurance company.  See Maryland Deposit Ins. Fund Corp. v. Commissioner, 88 T.C. 1050, 1060 (1987); Modern Home Life Ins. Co. v. Commissioner, 54 T.C. 935, 939-940 (1970).  The taxpayer has the burden to establish "to the satisfaction of the district director" that the unpaid losses comprise actual unpaid losses. Sec. 1.832-4(b), Income Tax Regs.; see also Hanover Ins. Co. v. Commissioner, supra.

Based on Mr. Merlino's calculations, respondent contends that, when established, the unpaid loss reserves claimed by Parthenon for years ended 1984, 1986, 1987, and 1988 were not reasonable based on acceptable actuarial methods within the meaning of section 832(b)(5).  Respondent contends that Parthenon's professional and general liability reserves should be increased for year ended 1984 by $16,177,587 and decreased for years ended 1986, 1987, and 1988 by $67,384,000, $14,978,000, and $29,058,000, respectively.  Additionally, respondent contends that Parthenon's workers' compensation liability reserve should be increased for years ended 1984, 1987, and 1988 by $6,098,709, $4,131,000, and $3,616,000, respectively.  Accordingly, respondent contends that net adjustments to Parthenon's total

reserves for years ended 1984, 1986, 1987, and 1988 should be made as follows:

| TYE | Increase (Decrease) in Total Reserves |
|-----|---------------------------------------|
| 1984 | $22,276,000 |
| 1986 | (67,384,000) |
| 1987 | (10,847,000) |
| 1988 | (25,442,000) |

An increase in reserve results in a larger allowable deduction and a decrease in reserve results in a smaller allowable deduction for the applicable year.

Petitioners do not dispute the increase in reserves for unpaid losses proposed by Mr. Merlino for year ended 1984, but they deny that any adjustment to the reserves is required for years ended 1986, 1987, and 1988. They contend that the reserves for years ended 1986 through 1988 fall within the range of reasonable estimates made at the time by Parthenon's independent consulting actuary.

Petitioners presented Mr. Biscoglia as their expert witness relating to the reasonableness of the professional and general liability reserves of Parthenon and PCIC as of December 31, 1986. For purposes of the trial, Mr. Biscoglia did not perform a subsequent independent analysis of the reserves as of yearend 1986. Rather, he reviewed the reserve analysis report dated

February 17, 1987 (1986 report), that had been prepared previously for Parthenon. In his expert witness report, Mr. Biscoglia concluded that the 1986 report had employed accepted and commonly used actuarial techniques, methodologies, and assumptions. He further concluded that the aggregate $187 million discounted reserves carried by Parthenon and PCIC for year ended 1986 were reasonable relative to the $176 million to $203 million range for the discounted reserves that was estimated for both companies in the 1986 report.

Additionally, petitioners contend that the reserves recorded on Parthenon's annual statements for years ended 1987 and 1988 represent fair and reasonable estimates of the loss and loss expense payments that Parthenon would be required to make in future years. In support of that contention, petitioners rely on the reserve analysis reports Mr. Biscoglia prepared during 1988 (for 1987 reserve requirements) and 1989 (for 1988 reserve requirements).

Respondent contends that the reserve analysis reports prepared by Mr. Biscoglia are irrelevant because they deal with both Parthenon and PCIC and the reserves applicable to each company cannot be segregated from the overall reserves applicable to both of them. Respondent contends further that, inasmuch as

Mr. Biscoglia's reserve analysis report for the policy year 1986 addresses only professional and general liability reserves, he cannot render an opinion as to the adequacy of the total loss and loss expense reserves of Parthenon.  Additionally, respondent contends that petitioners' computations that are based on Mr. Biscoglia's 1986 report are not relevant to the fairness and reasonableness of the unpaid losses reserves because Mr. Klaassen, not Mr. Biscoglia, served as Parthenon's actuary for year ended 1986.  Respondent contends further that Mr. Klaassen's computations are erroneous because they are based on an occurrence policy rather than a claims-made policy.  Respondent maintains that the adjustments to the unpaid losses reserves proposed by Mr. Merlino are correct.

Petitioners contend that Mr. Biscoglia's reserve analysis reports are relevant even though they address both Parthenon and PCIC because the relevant question in the consolidated return setting is whether the total reserves for both companies are reasonable in each applicable year.  Additionally, petitioners contend, the 1986 annual statements of Parthenon and PCIC show the respective reserve amounts that each booked.

Mr. Merlino did not calculate independently the amount or range that he believes represents a fair and reasonable estimate

of the unpaid losses and expenses that Parthenon actually would pay out.  Rather, for purposes of his reserve recommendations, Mr. Merlino focused on the reasonableness of the reserves from the viewpoint of whether the unpaid losses reserves as reported by Parthenon on its annual statements were either inadequate or excessive in comparison to the reserves recommended by Parthenon's independent consulting actuary.

With respect to the 1984 policy year, Mr. Merlino concluded that Parthenon had recorded total reserves in an amount that was $22,276,000 below the actuary's recommendation, and he recommended an upward reserve adjustment in that amount.  As stated above, neither party disputes the accuracy of the adjustment for the year ended 1984.  Accordingly, we accept as reasonable the increase in the unpaid losses reserves for that year proposed by Mr. Merlino.

With respect to the 1986 policy year, Mr. Merlino concluded that the professional and general liability reserves were overstated by $67,384,000.  Mr. Merlino calculated that adjustment by (1) reducing to $221 million the undiscounted reserve estimate of $238 million selected by Parthenon (to conform the unpaid losses reserve to Mr. Klaassen's original estimated recommended reserve level), and then (2) reducing that

$221 million by approximately $50 million to correct for Mr. Klaassen's use of occurrence policy factors in formulating his estimate. Mr. Merlino ignored the $218 million to $250 million range that Mr. Biscoglia recommended for the general and professional liability reserves for the 1986 policy year because of Mr. Merlino's belief that Mr. Klaassen served as Parthenon's consulting actuary for purposes of establishing the unpaid losses reserves for that year. That belief is based on the fact that Mr. Klaassen certified the adequacy of the reserves for the 1986 policy year.

The assumption that Mr. Klaassen served as Parthenon's actuary for purposes of establishing the 1986 policy year unpaid losses reserve levels is not supported by the record. The recommended reserve levels generally are calculated shortly after the close of the policy year for which the reserves relate. Both Mr. Klaassen and Mr. Biscoglia testified that Mr. Biscoglia replaced Mr. Klaassen as Parthenon's actuary during 1986. Additionally, the reserve recommendation report prepared by Mr. Klaassen for the 1986 policy year specifically states that he was requested to supply a second opinion relating to the reserves for professional liability losses and loss expenses as of the end of 1986. Based on the foregoing, we are persuaded that Mr.

Biscoglia, not Mr. Klaassen, served in the function of Parthenon's consulting actuary for purposes of computing recommended unpaid losses reserves for the 1986 policy year.

Mr. Merlino's challenge to the reasonableness of the unpaid losses reserves Parthenon claimed for the year ended 1986 is focused on the variance between the amount Parthenon reported on its annual statement for that year and the amount recommended by the consulting actuary. The $238 million unpaid losses reserve Parthenon reported for the year ended 1986 for professional and general liabilities is within the range of reasonable reserves recommended by Mr. Biscoglia for that year. Mr. Merlino did not challenge the unpaid losses reserves for any other line of business carried by Parthenon. Accordingly, the adjustment to the unpaid losses reserves proposed by Mr. Merlino for the year ended 1986 finds no support in the record.

Respondent's other arguments relating to the reasonableness of the unpaid losses reserves for the 1986 policy year are irrelevant in light of the parties' stipulation that: "In the event that the Court concludes [which we have] that Parthenon is an insurance company, the parties have agreed on all adjustments to reserves except for the single issue whether all or any portion of the reserve adjustments proposed by respondent's

expert witness Matthew P. Merlino and set out in his report dated October 27, 1994, should be made." Mr. Merlino's adjustment for the year ended 1986 is based on an erroneous assumption and is not otherwise supported in the record. Accordingly, we conclude that the adjustment proposed by Mr. Merlino for year ended 1986 is not warranted.

With respect to the 1987 and 1988 policy years, Mr. Merlino proposed adjusting Parthenon's reserves to conform to the reserves recommended in Mr. Biscoglia's reserve analysis reports for those years, but after first reducing the workers' compensation reserves by $12.5 million for 1987 and $11.2 million for 1988. For policy years 1987 and 1988, Mr. Biscoglia had recommended unpaid losses reserves for workers' compensation liabilities of $67,289,000 and $72,217,000, respectively. On the annual statements for those years, Parthenon had reported unpaid losses reserves for workers' compensation liabilities of $50,551,000 and $57,417,000, respectively.

The workers' compensation policy for 1987 and 1988 was retrospective. Parthenon accordingly received a premium installment in the year of coverage (policy year) that was designed to cover only a portion of the ultimate losses anticipated on that line of business for that year. During the

next year (retrospective year), Parthenon received a retrospective premium that was designed to cover the remaining losses for the policy year.

In his calculation of the workers' compensation unpaid losses reserve requirements for the policy year, Mr. Biscoglia estimated workers' compensation reserves for the entire year (including the portion of the liability paid during the retrospective year).  On the annual statement for the policy year, however, Parthenon reported workers' compensation liabilities relating only to the first-year installment premium. Parthenon recorded the balance of the expected losses for the policy year on the annual statement for the retrospective year when the retrospective premium was paid.

In calculating his adjustment to the workers' compensation unpaid losses reserves, Mr. Merlino reduced Mr. Biscoglia's estimate of the required workers' compensation unpaid losses reserve for each year to exclude the portion of the workers' compensation unpaid losses reserve related to the retrospective payment because he believed that petitioners would receive an undue tax advantage if Parthenon were allowed to deduct the total liability for the policy year without at the same time recording an offsetting amount of premium income.

Petitioners contend that the unpaid losses reserve for workers' compensation liabilities should include the total anticipated liability regardless of the year during which payment is recorded. We agree with petitioners. We find no basis for Mr. Merlino's adjustment in the workers' compensation unpaid losses reserves to account for unpaid premiums. Section 832(c) provides a deduction from the taxable income of an insurance company for "losses incurred" during the taxable year. Losses incurred includes a fair and reasonable estimate of actual outstanding unpaid losses that an insurance company will be required to pay sometime in the future. Sec. 1.832-4(b), Income Tax Regs. Neither the Code nor the regulations correlate unpaid losses to premiums paid. Accordingly, we conclude that Mr. Merlino's reduction of the unpaid losses reserve of $12.5 million for 1987 and $11.2 million for 1988 is not warranted.

Mr. Merlino further reduced the unpaid losses reserves for years ended 1987 and 1988 to conform the claimed unpaid losses reserves for workers' compensation and professional and general liabilities to the unpaid losses reserves for those lines of business recommended in Mr. Biscoglia's reserve analysis reports for those years. Respondent contends that those adjustments are required to bring the reserves to a level which meets the fair

and reasonable test of section 1.832-4(b), Income Tax Regs. Petitioners contend that the adjustments are not required because the unpaid losses reserves for years ended 1987 and 1988 fall within the range of reasonable estimates made by Mr. Biscoglia. Petitioners contend that Mr. Merlino's conclusion that the reserves should be reduced to the extent that the amounts exceed the amounts set out in Mr. Biscoglia's reserve analysis reports is incorrect inasmuch as the total reserves recorded by Parthenon fall within the ranges he recommended.

We agree with petitioners that the aggregate unpaid losses reserves for all lines of business for the applicable year, and not the individual reserves for each line of business, must meet the fair and reasonable test, Hanover Ins. Co. v. Commissioner, 69 T.C. at 271; Western Casualty Surety Co. v. Commissioner, 65 T.C. at 917, 919, but we do not agree that Mr. Biscoglia's reserve analysis reports and testimony establish that Parthenon's total unpaid losses reserves for years ended 1987 and 1988 in fact represent fair and reasonable estimates of Parthenon's actual unpaid losses and expenses. Petitioners have the burden of establishing that the unpaid losses comprise actual unpaid losses, Hanover Ins. Co. v. Commissioner, supra at 270, but have failed to do so in the instant case.

Petitioners contend that Mr. Merlino's adjustments for years ended 1987 and 1988 do not take into account that the total reserves are in fact within the range that Mr. Biscoglia recommended.  The reserve analysis reports relating specifically to Parthenon for years ended 1987 and 1988, however, do not delineate recommended ranges for Parthenon's unpaid losses reserves for professional and general liabilities for those years.  Rather, they set forth fixed dollar values for those reserves.  On brief, petitioners attempt to extrapolate a recommended range for Parthenon's unpaid losses reserves for professional and general liabilities for each year based on data setting forth recommended  ranges for unpaid losses reserves for all of HCA's and the sister subsidiaries' professional and general liabilities, including liabilities funded internally and those transferred to HCA's captive insurance companies.  The consolidated reports prepared for that purpose make no attempt to distribute the recommendations among the various entities.  We are not prepared to accept petitioners' naked assertion on brief that the assumptions and principles petitioners used to extrapolate ranges for the unpaid losses reserves for Parthenon's professional and general liabilities approximate fair and reasonable estimates of Parthenon's actual outstanding unpaid

losses for the years ended 1987 and 1988.  Mr. Biscoglia's summary testimony that he examined the reserves recorded by Parthenon for 1987 and 1988 and found that the total amounts were within an acceptable range for each year is not supported by any detailed explanation or documentation.  Mr. Merlino, on the other hand, in his expert report compared the ultimate losses recorded on Parthenon's annual statements as of yearend 1987 and as of yearend 1988 for the 1984 through 1988 policy years with the ultimate losses recorded on the annual statement as of yearend 1993 and concluded that the comparison indicated that the professional and general liability reserves for policy years 1987 and 1988, in retrospect, were materially overstated.  Based on the foregoing, we conclude that petitioners have not established the reasonableness of the unpaid losses reserves they are claiming for the unpaid professional and general liability losses, and, therefore, in keeping with the parties' stipulation, we hold that the adjustments proposed by Mr. Merlino conforming the unpaid losses reserves for workers' compensation and professional and general liabilities for the years ended 1987 and 1988 to the amounts recommended in Mr. Biscoglia's reserve analysis reports for those lines of business should be made.

In his report, Mr. Merlino recommends adjustments to Parthenon's workers' compensation unpaid losses reserves and professional and general liabilities reserves to conform those reserves to the amounts recommended by Mr. Biscoglia. Respondent has adopted Mr. Merlino's position to support the Government's position. We deem that action to be a concession by respondent that the values recommended by Mr. Biscoglia for the unpaid losses reserves for workers' compensation and professional and general liabilities are a fair and reasonable estimate of Parthenon's actual unpaid losses for those lines of business for years ended 1987 and 1988. In his report Mr. Merlino proposes no adjustment to the unpaid losses reserves for other lines of business carried by Parthenon for years ended 1987 and 1988. We deem that inaction as a concession by respondent that the reserves for those lines of business are a fair and reasonable estimate of Parthenon's actual unpaid losses for those lines of business for those years. We conclude that Parthenon is entitled to deduct additions to its reserves for the years in issue in amounts to be calculated by the parties in accordance with their stipulations and the foregoing.

Additionally, respondent contends that petitioners have failed to substantiate their claims regarding the reserves in

question because respondent is not able to review the methods and assumptions underlying petitioners' actuary's work inasmuch as petitioners did not supply sufficient information and they did not reconcile the actuarial information presented at trial with the annual statements of Parthenon and PCIC.  We view respondent's substantiation argument as a separate issue from whether Mr. Merlino's adjustments are correct, and, thus, that position is contrary to the parties' stipulation.  In the Tax Court, a stipulation is treated as a conclusive admission by the parties, and the Court will not permit a party to change or contradict a stipulation, except in extraordinary circumstances. Rule 91(e); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). We find no extraordinary circumstances present here to cause us to disregard the stipulation.  Accordingly, we do not address respondent's argument that petitioner failed to provide sufficient information or to reconcile the actuarial information presented at trial with the annual statements of Parthenon and PCIC.

　　To reflect the foregoing,

Decisions will be entered

under Rule 155.